Rose SOWINSKI and James McGill,
d/b/a Delrois Bar and Liquor
Store, Appellants,

v.

William Patrick WALKER, Personal Representative of the Estate of Robert Jason Walker, William Patrick Walker, Donna Irene Walker, and Rhonda Walker; Donald Lawrence Vaughn, Personal Representative of the Estate of Justin Daniel Vaughn, Donald Lawrence Vaughn, and Donna Vaughn, Appellees.

William Patrick Walker, Personal Representative of the Estate of Robert Jason Walker, William Patrick Walker, Donna Irene Walker, and Rhonda Walker; Donald Lawrence Vaughn, Personal Representative of The Estate of Justin Daniel Vaughn, Donald Lawrence Vaughn, and Donna Vaughn, Appellants,

v.

State of Alaska, Appellee.

Rose Sowinski and James McGill d/b/a
Delrois Bar and Liquor,
Appellants,

v.

William Patrick Walker, Personal Representative of The Estate of Robert Jason Walker, William Patrick Walker, Donna Irene Walker, and Rhonda Walker; Donald Lawrence Vaughn, Personal Representative of The Estate of Justin Daniel Vaughn, Donald Lawrence Vaughn, and Donna Vaughn, Appellees.

Nos. S–12114, S–12203, S–12734.

Supreme Court of Alaska.

Dec. 31, 2008.

Rehearing Stricken Feb. 18, 2009.

Sarah J. Tugman, Anchorage, for Appellants Rose Sowinski and James McGill.

Phillip Paul Weidner, Michael Cohn, Weidner & Associates, Inc., Anchorage, for Walker Appellants/Appellees.

Charles W. Coe, Law Office of Charles W. Coe, Anchorage, for Vaughn Appellants/Appellees.

Joanne M. Grace, Assistant Attorney General, Talis J. Colberg, Attorney General, Anchorage, for Appellee State of Alaska.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, CARPENETI, and WINFREE, Justices.

## OPINION

MATTHEWS, Justice.

## I. INTRODUCTION

After consuming alcohol purchased at DelRois Liquor Store, minors Robert Walker and Justin Vaughn rode together on an ATV and were killed when they struck a cable stretched across an access road. The personal representatives of their estates and the decedents' families sued DelRois for providing alcohol to the boys and the State of Alaska for failing to maintain the access road free of hazards. The superior court granted the State summary judgment. The personal representatives of the decedents' estates and the decedents' families appeal. The claims against DelRois proceeded to final judgment after a jury trial. The jury found DelRois partly responsible and apportioned to it a share of the plaintiffs' damages. DelRois appeals. We hold the State did not have a duty either to maintain the access road or to remove the cable running across it. With respect to DelRois's appeal, because we conclude that the legislature's adoption of pure several liability in AS 09.17.080 supersedes our holding in *Loeb v. Rasmussen*,[1] we hold the superior court erred in requiring DelRois to bear the decedents' share of responsibility for the accident. We conclude that under Alaska's system of comparative negligence with pure several liability, a dram shop is liable only for its percentage of fault in actions between the shop and a minor that involve the shop's provision of and the minor's use of alcohol. While we reject DelRois's arguments regarding the superior court's failure to reduce the Walker and Vaughn plaintiffs' recovery by their settlement amount and to exclude various testimony, we hold that the superior court erred by allowing the jury to award loss of enjoyment of life damages and by instructing the jury that it could award nonpecuniary damages to Walker's sister. Likewise, we hold the superior court erred in instructing the jury that it could award damages to the decedents' parents for loss of consortium for the decedents' post-majority period. We therefore vacate the judgment against DelRois and the various awards to the Walker and Vaughn plaintiffs and remand for modification.

## II. FACTS AND PROCEEDINGS

This case arises from an ATV accident in which two boys died. While the parties dispute the facts, it appears that sometime in the late evening of June 24, 1996, or the early morning of June 25, 1996, minors Justin Vaughn and Robert Walker (collectively "the decedents") both consumed alcohol they had purchased at DelRois Liquor Store.[2] After

---

1. 822 P.2d 914 (Alaska 1991).

2. In 1996 DelRois was owned by Rose Sowinski and James McGill. Rose's surname later

drinking, the decedents and Crystal Brueggeman rode an ATV northeast along a beach adjacent to the Knik River, with Vaughn driving.[3] At about four o'clock in the morning, Vaughn turned the ATV off of the beach and drove southwest down an access road[4] that connected the beach to Knik River Road. Vaughn drove along the access road, through property owned by Raone Bingham,[5] and crossed onto property owned by the federal government. Raone's son, Carl Bingham, had strung a cable across the access road on the federal land to prevent trespassers from entering the Bingham property. The ATV struck the cable, killing Vaughn and Walker within seconds or minutes.[6] It is unknown whether they suffered. Robert Walker's parents, Donna and William Walker, and sister, Rhonda Walker, were notified of the accident at approximately seven o'clock that same morning and arrived on the scene in time to view the decedents' bodies.

The personal representatives of the decedents' estates and the decedents' families[7] (collectively "the Walker and Vaughn plaintiffs") sued several parties in superior court to recover damages resulting from the accident. They sued DelRois for providing alcohol to the underage decedents and the State for failing to maintain the access road free of hazards. The Walker and Vaughn plaintiffs also sued Raone and Carl Bingham for erecting the cable that killed their sons, but the plaintiffs and Binghams eventually settled these claims.[8] The personal representatives of the decedents' estates sued to recover for the decedents' pain and suffering, loss of enjoyment of life, and loss of future earnings. The decedents' families—including Justin Vaughn's parents (Donald and Donna Vaughn) and Robert Walker's parents (William and Donna Walker) and sister (Rhonda Walker)—sought to recover damages for emotional distress and loss of consortium.[9]

The State moved for summary judgment, arguing that it did not own the land on which the access road was located and that there was no other basis for holding the State liable for failing to maintain the access road. The superior court agreed and dismissed all claims against the State. The Walker and Vaughn plaintiffs appeal.

The Walker and Vaughn plaintiffs' claims against DelRois proceeded to a jury trial. The superior court provided a special verdict form to the jury. In answering questions on this form the jury made several factual findings, including the damages suffered by each plaintiff, and apportioned percentages of fault for the accident. The jury found that DelRois provided alcohol to the decedents and that this act was a cause of the accident. It apportioned to DelRois thirty-five percent of the fault for the accident. The jury apportioned twenty-five percent of the fault for the

changed to Gama. Carol McGill was also a named defendant in the case.

3. It appears that at some point Vaughn was driving to escape from two other parties to the litigation, Sandra K. Cancel Shell and Emmanuel Cancel, who were chasing the ATV in another vehicle. This chase is of negligible relevance to the issues on appeal.

4. There is no agreed-upon terminology for this path; pleadings in this litigation have referred to it as the "roadway," "driveway," or "Old Knik River Road." We refer to it as the "access road."

5. Court documents variously spell Ms. Bingham's name "Raone" or "Roane." We use "Raone" because that spelling was used in the settlement agreement entered into between the Walker and Vaughn plaintiffs and Ms. Bingham.

6. Crystal Brueggeman escaped with severe but nonfatal injuries.

7. The Walker plaintiffs included: William Walker, Robert Walker's father, as personal representative of the Estate of Robert Walker; Robert Walker's parents, William and Donna Walker; Robert Walker's grandmother, Glenna Weeks; and Robert Walker's siblings, Rhonda, Katie, and Jonathan Walker.

The Vaughn plaintiffs included: Donald Vaughn, Justin Vaughn's father, as personal representative of the Estate of Justin Vaughn and Justin Vaughn's parents, Donald and Donna Vaughn.

8. The Walker and Vaughn plaintiffs also sued the Cancels for chasing Vaughn onto the access road, but the disposition of that claim is not relevant to this appeal.

9. Though Robert Walker's two other siblings (Katie and Jonathan Walker) and grandmother (Glenna Weeks) also sued, the disposition of their claims is not pertinent to this appeal.

accident to Justin Vaughn and two percent to Robert Walker.[10] The jury also valued the loss of the decedents' estates—the decedents' pain and suffering, loss of enjoyment of life, and loss of future earnings—and the loss of the decedents' families—emotional damages and loss of consortium.[11]

The superior court entered judgment in favor of the Walker and Vaughn plaintiffs. The court further ordered DelRois to pay damages not only for its share of responsibility for the accident, thirty-five percent, but also the decedents' share of responsibility, twenty-seven percent total.[12] The court reasoned that DelRois could not reduce its share of responsibility by that of the decedents' because the court found that Alaska statutes and case law did not permit a comparative negligence defense. DelRois appeals.

The certificate for distribution of the final judgment was mailed by the clerk of court on November 11, 2005. The Walker and Vaughn plaintiffs moved for attorney's fees on May 12, 2006. DelRois opposed the motion on untimeliness grounds. After considering supplemental memoranda, the court decided to award fees despite the lateness of the motion. The court awarded partial attorney's fees of more than $160,000 under the "contested with trial" schedule of Civil Rule 82(b)(1). DelRois has filed a separate appeal from this award which we consider with its appeal on the merits.

## III. THE WALKER AND VAUGHN PLAINTIFFS' APPEAL

The Walker and Vaughn plaintiffs appeal the superior court's determination that the State did not have a duty to maintain the access road and keep it free from hazards. To understand their claims, it is helpful to understand the access road's history.

The access road runs northeast through two pieces of land. These pieces of land share a common border running north and south. Both pieces of land are bordered on the north by the Knik River. The Bingham family has owned the eastern piece of land for all time periods relevant to this case. As we explain below, the federal government has owned the western piece of land for all time periods relevant to this case.

In the early 1970s the State began planning to construct Knik River Road. The road was to run east to west along the southern portions of both pieces of property. The problem for the State was that it did not own either piece of land.

With respect to the Binghams' land, the State merely condemned the land it needed for its right-of-way. The Binghams objected and claimed that construction of Knik River Road would sever the southwest corner of their land. The State and the Binghams settled this dispute by agreeing that the State would take title to the severed portion

---

10. The jury apportioned the remaining fault between the decedents' parents, the Cancels, and the Binghams.

11. The jury assessed damages for the Estate of Robert Walker at $10,000 for past economic loss to the time of trial; $10,000 for past non-economic loss to the time of trial (including, among other things, loss of enjoyment of life); $300,000 for future economic loss; and $10,000 for future non-economic loss (loss of enjoyment of life).

The jury assessed damages for William Walker at $125,000 for past non-economic loss and $75,000 for future non-economic loss.
The jury assessed damages for Donna Walker at $125,000 for past non-economic loss and $75,000 for future non-economic loss.
The jury assessed damages for Rhonda Walker at $60,000 for past non-economic loss and $40,000 for future non-economic loss.
The jury assessed damages for the Estate of Justin Vaughn at $20,000 for past economic loss

to the time of trial; $10,000 for past non-economic loss to the time of trial (including, among other things, loss of enjoyment of life); $400,000 for future economic loss; and $10,000 for future non-economic loss (loss of enjoyment of life).
The jury assessed damages for Donald Vaughn at $150,000 for past non-economic loss and $75,000 for future non-economic loss.
The jury assessed damages for Donna Vaughn at $125,000 for past non-economic loss and $75,000 for future non-economic loss.

12. DelRois was thus responsible for sixty-two percent (twenty-seven percent plus thirty-five percent) of this loss. The principal awarded to each plaintiff recovering against DelRois was thus arrived at by multiplying the applicable verdict amount by .62. The resulting awards were: Estate of Robert Walker—$204,600; William Walker—$124,000; Donna Walker—$124,000; Rhonda Walker—$62,000; Estate of Justin Vaughn—$272,800; Donald Vaughn—$139,500; Donna Vaughn—$124,000.

of land and compensate the Binghams accordingly. Of particular relevance to this appeal, the State in the settlement agreement promised that the access road would remain a "public road" where it crossed federal land.

The State had greater difficulties, however, obtaining a right-of-way across the western property. Before 1971 the western piece of property was federal land managed by the Federal Bureau of Land Management (BLM). In 1971 Congress withdrew this land in the Alaska Native Claims Settlement Act.[13] In 1972 the State requested that BLM grant the State a right-of-way to become Knik River Road. BLM denied this request.[14] In 1985 the State again applied to BLM for a right-of-way. The application requested a 200–foot–wide right-of-way through the federal land. In 1987 BLM finally granted the State a 100–foot–wide right-of-way along Knik River Road, extending fifty feet on each side of the centerline of Knik River Road.

In 1986 the Binghams strung a cable across the access road to keep trespassers off of their land. Carl Bingham placed the cable roughly 100 feet from the centerline of Knik River Road, fifty feet beyond the State's right-of-way. Between 1986 and the time of the decedents' accident, the cable caused at least one other accident: in 1990, a car turned off of Knik River Road and collided with the cable, sustaining minor damage. The Binghams notified the State of this accident and a state trooper filed a report.

As of the decedents' accident, the access road ran from Knik River Road, through federal land—including the portion of the access road across which Carl Bingham strung the cable—and onto the Binghams' property. The State has never designated the access road as part of the state highway system and has never recognized the access road as a state-owned right-of-way.

Before trial, the State moved for summary judgment, arguing that it had no duty to maintain the access road or keep it free from obstruction and thus was not liable for the accident. The Walker and Vaughn plaintiffs presented a number of theories in their opposition to the State's motion in support of such a duty. The superior court granted the State's motion for summary judgment.

## A. The Superior Court Correctly Held that the State Did Not Have a Contractual Duty To Maintain the Access Road.

The Walker and Vaughn plaintiffs argue that the State had a contractual duty to maintain the access road, arising from its 1974 settlement with Carl Bingham in the condemnation action. In the 1974 settlement, the State agreed that "the two presently constructed access roads connecting defendant's remaining property with the Knik River Road are public roads." The plaintiffs contend that the term "public road" is ambiguous, both in legal and common usage, and thus should be construed in their favor on summary judgment to include a promise by the State to protect and maintain the access road for the benefit of the traveling public. The plaintiffs claim that extrinsic evidence shows that the State intended to maintain the access road.

The State answers that the agreement between it and Carl Bingham did not obligate the State to maintain the access road for the benefit of the Binghams and certainly not for the benefit of third parties. The State argues that this settlement merely obligated the State to preserve access on the road to the Bingham property for the Binghams themselves.

 We review grants of summary judgment de novo.[15] The goal of contract interpretation is to give effect to the reasonable expectations of the parties.[16] In pursuit of this goal, we consider the contract's lan-

**13.** 43 U.S.C. § 1610(a)(1)(A), (b)(1) (2006). In 1974 the Eklutna Village Corporation selected this land, although this application was still pending at the time of litigation.

**14.** The State constructed Knik River Road in 1973. BLM denied the State's request in 1976.

**15.** *Monzingo v. Alaska Air Group, Inc.*, 112 P.3d 655, 658–59 (Alaska 2005).

**16.** *Stepanov v. Homer Elec. Ass'n*, 814 P.2d 731, 734 (Alaska 1991).

guage as well as relevant extrinsic evidence—including subsequent conduct of the parties.[17] While contract interpretation is generally a matter of law,[18] and thus appropriate for summary judgment, factual questions may arise with respect to extrinsic evidence or the parties' intent.[19] Summary judgment is appropriate only if after making all reasonable inferences about such open factual questions in favor of the nonmoving party, the moving party is still entitled to judgment as a matter of law.[20]

■ As an initial matter, we agree with the Walker and Vaughn plaintiffs that the language of the agreement is ambiguous. The State promised that the access road would be a "public road." The plain meaning of the term "public road" is merely a road that the public may freely use.[21] The term "public road" does not appear to have any particular meaning in Alaska law—it is not defined either in Alaska statutes or regulations. While there are numerous roads in Alaska that are accessible to the public that the State does not maintain,[22] there are also a vast number of roads used by the public that the State does maintain. Given these contradicting facts, it would be possible based on the settlement's language—though not necessary—for the State or Carl Bingham to construe the settlement as obligating the State to maintain the access road. Accordingly, we must look to the extrinsic evidence surrounding the settlement to determine whether the State had such an obligation.

As another initial matter, we must accept that the State has never maintained the access road because there is insufficient evi-dence to support a reasonable inference to the contrary.[23] The State has only maintained the portion of the access road where it connects to Knik River Road. From a photograph that was taken after the accident of the portion of the access road across which the Binghams strung the cable, that portion appeared completely unmaintained. 17 AAC 20.040 generally prohibits the Department of Transportation and Public Facilities from maintaining roads that the State has not designated as highways, such as the access road. It is normal for the State to remove obstacles from state-maintained roads, but the Binghams left the cable across the access road for a decade before the accident. This strongly suggests that the State has never maintained the access road.

The Walker and Vaughn plaintiffs provide no evidence to the contrary. They cite the deposition testimony of Daniel Beardsley, the Chief Right–of–Way Agent for the Alaska Department of Transportation and Public Facilities, Central Region, from 1987 through 1994. But Beardsley testified that the State only placed and maintained gravel on the entrance to Knik River Road to allow travel between this road and the access road. The Walker and Vaughn plaintiffs also cite the deposition of Chris Kepler, maintenance manager for the Department of Transportation. The plaintiffs highlight that Kepler admitted that the Department of Transportation might have relied upon an erroneous map that showed the State's right-of-way extending 100 feet from the centerline of Knik River Road, just past where the Binghams placed the cable. But Kepler testified, as Beardsley did, that the Department of Transportation only maintained the gravel on

**17.** *Leisnoi, Inc. v. Stratman,* 956 P.2d 452, 454 (Alaska 1998).

**18.** *Norville v. Carr–Gottstein Foods Co.,* 84 P.3d 996, 1000 n. 1 (Alaska 2004).

**19.** *See Sprucewood Inv. Corp. v. Alaska Hous. Fin. Corp.,* 33 P.3d 1156, 1161 (Alaska 2001).

**20.** *Norville,* 84 P.3d at 1000 n. 1.

**21.** *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1836 (Philip Babcock Gove et al. eds., 14th ed.1961) (defining "public" to mean "accessible to or shared by all members of the community");

*see also* 39 AM.JUR.2D *Highways, Streets, and Bridges* § 3 (1999) ("Whether a road is 'public' or 'private' is determined by extent of the right to use it, and not by the extent to which that right is exercised or by quantity of travel over it.").

**22.** *See* 17 Alaska Administrative Code (AAC) 20.040 (2004) (prohibiting the state from maintaining roads not part of the Alaska Highway System).

**23.** *See Norville,* 84 P.3d at 1000 n. 1 (stating that when adjudicating summary judgments, courts must make all reasonable inferences in favor of the nonmovant).

Knik River Road. Accordingly, we cannot reasonably infer, for the purposes of summary judgment, that the State has maintained any significant portion of the access road.

Turning now to the main issue—whether extrinsic evidence shows that the condemnation settlement contractually obligated the State to maintain the access road—it is clear that the State had no such obligation. The fact that the State has never maintained the access road provides the strongest evidence that it was not contractually obligated to do so.[24] If Carl Bingham had intended the condemnation settlement to contractually obligate the State to maintain the access road, he likely would have complained at least once during the twenty years following the execution of that agreement that the State was in breach. Yet the record does not disclose such a complaint. Indeed, the Binghams performed at least some maintenance on the access road themselves, plowing the road in the winter.[25]

Rather, the evidence suggests that the State and Carl Bingham ostensibly entered the settlement for two other, unrelated purposes. First, the State and Bingham needed to settle the amount of compensation that the State would provide Bingham for the land it had taken from him. Second, the State and Bingham wanted to ensure that Bingham would continue to have use of the access road for the purpose of getting to his property. The access road was one of two roads by which Bingham could reach his property before the State built Knik River Road. As described above, in the early 1970s, the status of the land on which the access road sat was in flux. The State sought to protect

Bingham's use of this road throughout these changes and into the future. Thus, the State and Bingham had two pressing issues in mind when entering the settlement—compensating Bingham and preserving his use of the access road. Both of these issues could be resolved without requiring the State to maintain the access road.

### B. The Superior Court Correctly Held that the State Did Not Have a Tort Duty To Remove the Cable from the Access Road.

 The Walker and Vaughn plaintiffs argue that the State breached a tort duty to keep the access road free from encroachments. The question here is the existence of a tort duty of care. This is a question of law, which we review de novo.[26] Absent an applicable duty based on statute, regulation, contract, or existing common law tort doctrine, relevant considerations as to whether a duty of care exists include the foreseeability of harm, the connection between the allegedly tortious conduct and the injury, the moral blameworthiness of the conduct, prevention of future harm, the burden on the defendant and community of imposing such a duty, and the possibilities of insuring against such harms.[27]

 There is a compelling reason for us to reject imposing a tort duty upon the State: the Department of Transportation has already considered the question and has determined that the State should not maintain such roads. This policy is implemented in 17 AAC 10.020(g), which provides that "[t]he burden and cost of maintaining a driveway or

---

**24.** *See Leisnoi, Inc. v. Stratman,* 956 P.2d 452, 454 (Alaska 1998) (holding that in determining the intent of contracting parties, courts may consider their subsequent conduct).

**25.** This uncontested evidence also disposes of the Walker and Vaughn plaintiffs' argument that the State "possessed" the access road and thus was liable on a theory of premises liability.

**26.** *Beck v. State, Dep't of Transp. & Pub. Facilities,* 837 P.2d 105, 109 (Alaska 1992); *see also Arctic Tug & Barge, Inc. v. Raleigh, Schwarz & Powell,* 956 P.2d 1199, 1203 (Alaska 1998); *Div. of Corr., Dep't of Health & Soc. Servs. v. Neakok,* 721 P.2d 1121, 1127 & n. 7 (Alaska 1986). We

follow *Beck* in this case because ascertaining the existence of the tort duty the Walker and Vaughn plaintiffs assert involves balancing competing policy prerogatives in a setting that does not require fact-driven determinations.

**27.** *See D.S.W. ex rel. R.M.W. v. Fairbanks N. Star Borough Sch. Dist.,* 628 P.2d 554, 555 (Alaska 1981) (quoting *Peter W. v. San Francisco Unified Sch. Dist.,* 60 Cal.App.3d 814, 131 Cal.Rptr. 854, 859–60 (1976)); *see also Parnell v. Peak Oilfield Serv. Co.,* 174 P.3d 757, 767 (Alaska 2007); *Kallstrom v. United States,* 43 P.3d 162, 167 (Alaska 2002).

approach road within a highway right-of-way is upon the lands served by a driveway or approach road." Similarly, 17 AAC 20.040 states that "[n]o road maintenance of any nature shall be performed by the state on a highway which is not part of the Alaska Highway System, except by reimbursable agreement." We will not lightly impose a duty upon the State to act in contravention of the informed judgment of an agency.[28] The Walker and Vaughn plaintiffs' arguments are insufficient to justify a departure from the Department of Transportation's assessment.

The Walker and Vaughn plaintiffs also argue that the State's breach of its contractual obligation to maintain the access road makes the State liable not only in contract, but also in tort. This argument fails in light of our holding that the State had no such contractual obligation. Further, we have previously rejected the argument that a breach of contract alone—without an independent viable theory of tort recovery—could give rise to damages in tort.[29]

 The Walker and Vaughn plaintiffs further contend that the State's mistaken belief that it had a duty to maintain the Knik River Road right-of-way up to 100 feet beyond the centerline of that road—a portion of land that included the cable—gave rise to an actual duty to do so. In our discussion of the Walker and Vaughn plaintiffs' contract claim, we determined that the evidence cannot reasonably be interpreted to support a factual conclusion that the State maintained the access road. Moreover, even if the State erroneously believed that it had an obligation to maintain the access road, this belief would not give rise to an actual obligation to do so. Generally, a defendant's mistaken view of the

law does not alter its actual legal obligations.[30] Indeed, the law of negligence, by definition, imposes liability upon defendants who may not have known that their conduct was tortious. The law seeks to impose tort duties where they are socially desirable and, conversely, withholds tort duties where they are socially undesirable.[31] If we would otherwise refuse to impose a duty on the State to maintain the access road, then we will not impose one simply because the State believed it existed.

The Walker and Vaughn plaintiffs additionally argue that the State's creation and maintenance of a gravel connection between Knik River Road and the access road obligated the State to maintain the entire access road. But it is inappropriate to impose liability on the State for the maintenance of any access road that happens to connect to a state-maintained road. We agree with the superior court's analysis of this contention:

> The principle distilled from plaintiffs' argument is that every time the state connects a private road, driveway, or trail with a state highway, the state assumes a duty to guarantee safe unobstructed passage for the length of the private road, driveway, or trail. The court must conclude that such a far reaching conclusion cannot stand, especially in Alaska where long stretches of rural and urban state highway connect with innumerable [trails], paths, driveways, public and private roads.

Finally, the Walker and Vaughn plaintiffs argue that the State's knowledge of the danger that the cable posed, following its investigation of the prior car accident involving the same cable, gave rise to a tort duty to remove the cable or to warn travelers of its danger. The factors relevant to the imposi-

---

**28.** While we recognize the general rule that compliance with a statute or regulation does not constitute a complete defense to tort liability, this case involves an exception to this general rule. *See* 1 DAN B. DOBBS, THE LAW OF TORTS § 224, at 573 (2001); *see also Ramirez v. Plough, Inc.,* 6 Cal.4th 539, 25 Cal.Rptr.2d 97, 863 P.2d 167, 172 (1993) ("Where the evidence shows no unusual circumstances, but only the ordinary situation contemplated by the statute or administrative rule, the 'the minimum standard prescribed by the legislation or regulation may be accepted by the triers of fact, or by the court as a matter of law, as sufficient for the occasion.'" (quoting

RESTATEMENT (SECOND) OF TORTS § 288C cmt. a (1965))).

**29.** *See Alaska Pac. Assurance Co. v. Collins,* 794 P.2d 936, 946 (Alaska 1990).

**30.** *Cf.* 1 WAYNE R. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 5.6(d) (2d ed.2003) (stating that the criminal law generally does not withhold criminal liability simply because the defendant was unaware his conduct constituted a crime).

**31.** *See Neakok,* 721 P.2d at 1125.

tion of a tort duty provide mixed support for the proposition that where the State has discovered a danger on non-state land, it should have a duty to remove that danger. Given that the cable had already caused a car accident, the State could foresee the danger that the cable posed.[32] And removing the cable would have been nearly costless and would have prevented this accident, unless it was reinstalled.[33] However, the State was not morally culpable for failing to remove a hazard on non-state property.[34] Also, the costs to the community of imposing this burden on the State are high: it would require the State to enter non-state property and dictate the use of that property to non-state actors.[35] We find that the mixed results of the tort duty analysis are insufficient to override the Department of Transportation's considered decision that the State should not be in the business of maintaining driveways, approach roads, and roads not designated as highways.

### C. The Walker and Vaughn Plaintiffs' Estoppel Arguments Are Without Merit.

The Walker and Vaughn plaintiffs argue that the doctrines of quasi-estoppel, equitable estoppel, and collateral estoppel bar the State from arguing that it had no duty to keep the access road free from hazards. For each type of estoppel, the plaintiffs make the same general argument: by entering into the condemnation settlement and by using erroneous maps, the State represented to the public that it has been maintaining the access road—a representation upon which the decedents relied to their demise. Whether the

State should be estopped from arguing that it had no duty to maintain the access road presents questions of law which we review de novo.[36]

The doctrine of quasi-estoppel precludes a party from taking a position in litigation that is inconsistent with a position taken earlier by that same party—but only if allowing that party to maintain the latter, inconsistent position would be unconscionable.[37] The doctrine of equitable estoppel bars a speaker from taking a position inconsistent with a prior statement when another person has reasonably and detrimentally relied on the earlier statement.[38] Equitable estoppel is similar to quasi-estoppel in form. In function, however, equitable estoppel seeks to protect parties' reasonable expectations,[39] whereas quasi-estoppel seeks to protect the integrity of litigation.[40]

Neither quasi-estoppel nor equitable estoppel bars the State from arguing that it had no duty to maintain the access road. The Walker and Vaughn plaintiffs' estoppel arguments depend upon a conclusion that the State had publicly stated that it had a duty to maintain the road. But such a conclusion has no justification on this record. The Walker and Vaughn plaintiffs' quasi and equitable estoppel arguments are unfounded and the superior court correctly rejected them.

The doctrine of collateral estoppel prevents parties from relitigating issues that a court has already decided against them. Collateral estoppel will bar a party

---

**32.** See D.S.W., 628 P.2d at 555 (holding that the foreseeability of harm is an important factor in determining whether to impose a tort duty).

**33.** See id. (holding that when deciding whether to impose a tort duty, courts should consider the cost of such a burden and the likelihood imposing such a duty would prevent harm).

**34.** See id. (holding that when deciding whether to impose a tort duty, courts should consider the moral blame attached to the defendant's conduct).

**35.** See id. (holding that when deciding whether to impose a tort duty, courts should consider the burdens to society of such a duty).

**36.** See Smith v. Stratton, 835 P.2d 1162, 1163–64 & n. 4 (Alaska 1992).

**37.** Dressel v. Weeks, 779 P.2d 324, 329 (Alaska 1989).

**38.** Krize v. Krize, 145 P.3d 481, 486 & n. 19 (Alaska 2006).

**39.** See id.

**40.** Smith ex rel. Smith v. Marchant Enters., Inc., 791 P.2d 354, 356 (Alaska 1990).

from relitigating an issue adjudicated in a prior action if four conditions are met: (1) the party was a party or in privity with a party in the initial action, (2) the issue adjudicated in the prior action is identical to the issue the party seeks to relitigate, (3) the issue was resolved in the first action by a final judgment on the merits, and (4) the determination of the issue was essential to the final judgment.[41]

 The Walker and Vaughn plaintiffs argue that the State's stipulated settlement in its condemnation action, which was incorporated into a final judgment, obligated it to maintain the access road and thus that the State is collaterally estopped from relitigating this issue here. This argument is without merit. No court has adjudicated the scope of the State's duties under the condemnation settlement. With respect to their collateral estoppel argument, the Walker and Vaughn plaintiffs again assume the conclusion that they are trying to prove: the State promised to maintain the access road free from hazards. Accordingly, this argument fails and the superior court correctly rejected it.

## IV. DELROIS'S APPEAL

### A. The Superior Court Erred by Holding that Delrois Should Bear the Decedents' Share of Responsibility for the Accident.

Using a special verdict form provided by the court, the jury found that the decedents together bore twenty-seven percent of the responsibility for the accident and that Del-Rois bore thirty-five percent. The court then added these percentages together and held that DelRois must pay sixty-two percent of the total damages.

DelRois argues that the superior court erred by finding that Alaska's dram shop statute, AS 04.21.020, is not subject to Alaska's most recent tort reform which enacted pure several liability. While DelRois acknowledges that our holding in *Loeb v. Rasmussen*[42] suggests that the doctrine of comparative negligence does not apply where the victim is a minor and his negligence results from the defendant's illegal sale of alcohol to him, DelRois argues that AS 09.17.080 abrogated *Loeb* and now imposes a system of pure comparative negligence where several liability applies to all parties-including minors.[43]

The Walker and Vaughn plaintiffs oppose this argument. They generally argue that the newer statutory system is too broad to abrogate our prior determination that statutes barring the sale of alcohol to minors represent "exceptional statutes" that preclude a vendor from asserting the minor's fault in a negligence suit.

This court has not yet had the opportunity to address the status of Alaska's dram shop law in light of Alaska's adoption of pure several liability. Whether a defendant's liability arising from the sale of alcohol to a minor is reduced by that minor's negligence in purchasing and consuming the alcohol is a question of law which we review de novo.[44]

We hold that the enactment of pure several liability in AS 09.17.080 represents a changed condition[45] and that AS 04.21.020 is

---

**41.** *Matanuska Elec. Ass'n v. Chugach Elec. Ass'n,* 99 P.3d 553, 561 n. 30 (Alaska 2004) (citing *Universal Motors, Inc. v. Neary,* 984 P.2d 515, 518 n. 11 (Alaska 1999)).

**42.** 822 P.2d 914 (Alaska 1991).

**43.** DelRois does not contend that courts cannot hold alcohol vendors liable for damages resulting from their illegal provision of alcohol to minors.

**44.** *Loeb,* 822 P.2d at 916–17.

**45.** We have explained that

> a prior decision may be abandoned because of "changed conditions" if "related principles of law have so far developed as to have left the old rule no more than a remnant of abandoned doctrine, [or] facts have so changed[,] or come to be seen so differently, as to have robbed the old rule of significant application."

*Pratt & Whitney Canada, Inc. v. Sheehan,* 852 P.2d 1173, 1176 (Alaska 1993) (quoting *Planned Parenthood v. Casey,* 505 U.S. 833, 855, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992)).

subject to pure several liability. Accordingly, we conclude that our prior holding in *Loeb v. Rasmussen* has been superseded by AS 09.17.080 and that DelRois is responsible only for its own share of the damages.

### 1. Alaska's transition to pure comparative negligence with pure several liability.

Under Alaska's former joint and several liability tort system, each tortfeasor could be held responsible for all damages resulting from a negligent act regardless of the individual tortfeasor's share of the fault.[46] The first step toward our current system of comparative negligence with pure several liability came in 1970 when the legislature granted joint tortfeasors the right of contribution by enacting the Alaska Uniform Contribution Among Tortfeasors Act.[47] The next step came in 1975 when we rejected the doctrine of contributory negligence and adopted the doctrine of comparative negligence in *Kaatz v. State*.[48] However, *Kaatz* only adopted pure comparative negligence and did not alter Alaska's status as a joint and several liability jurisdiction.[49]

In 1986 the legislature passed the Tort Reform Act,[50] which was modeled after the Uniform Comparative Fault Act. That legislation codified a broad comparative negligence doctrine[51] but retained a version of joint and several liability.[52] The 1986 version of AS 09.17.080 provided:

> Apportionment of damages. (a) In all actions involving fault of more than one party to the action, including third-party defendants and persons who have been released under AS 09.16.040, the court, unless otherwise agreed by all parties, shall instruct the jury to answer special

interrogatories or, if there is no jury, shall make findings indicating

> (1) the amount of damages each claimant would be entitled to recover if contributory fault is disregarded; and

> (2) the percentage of the total fault of all the parties to each claim that is allocated to each claimant, defendant, third-party defendant, and person who has been released from liability under AS 09.16.040.

> (b) In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault, and the extent of the causal relation between the conduct and the damages claimed. The trier of fact may determine that two or more persons are to be treated as a single party if their conduct was a cause of the damages claimed and the separate act or omission of each person cannot be distinguished.

> (c) The court shall determine the award of damages to each claimant in accordance with the findings, subject to a reduction under AS 09.16.040, and enter judgment against each party liable. The court shall also determine and state in the judgment each party's equitable share of the obligation to each claimant in accordance with the respective percentages of fault.

> (d) The court shall enter judgment against each party liable on the basis of joint and several liability, except that a party who is allocated less than 50 percent of the total fault allocated to all the parties may not be jointly liable for more than twice the percentage of fault allocated to that party.

The 1986 legislation was amended in 1988 when Alaska voters passed the Tort Reform Ballot Initiative, which replaced joint and

---

**46.** *Petrolane Inc. v. Robles*, 154 P.3d 1014, 1019 (Alaska 2007) (recounting the history of Alaska's tort reform legislation).

**47.** Ch. 80, § 1, SLA 1970; *see also Kodiak Island Borough v. Roe*, 63 P.3d 1009, 1013 (Alaska 2003).

**48.** 540 P.2d 1037, 1049 (Alaska 1975).

**49.** *Arctic Structures, Inc. v. Wedmore*, 605 P.2d 426, 429–30, 432 (Alaska 1979).

**50.** Ch. 139, §§ 1–11, SLA 1986; *see also Smith v. Ingersoll–Rand Co.*, 14 P.3d 990, 994 (Alaska 2000).

**51.** Former AS 09.17.060.

**52.** Former AS 09.17.080(d); *see also Arctic Structures, Inc.*, 605 P.2d at 432 & n. 17 (explaining that the Uniform Comparative Fault Act did not abolish joint and several liability).

several liability with pure several liability.[53] The new portion of the AS 09.17.080, which went into effect in 1989,[54] provided:

> (d) The court shall enter judgment against each party liable on the basis of several liability in accordance with that party's percentage of fault.

Thus, Alaska has a system of pure comparative negligence with several liability. Alaska Statute 09.17.060 promulgates the basic comparative negligence principle that a claimant cannot recover the portion of damages attributable to the claimant's own fault for the harm complained of. Alaska Statute 09.17.080 promulgates the additional rule that of the total fault for harm attributable to defendants—not the claimant—the court shall enter a judgment against each defendant only for the defendant's own percentage of the total fault.[55]

### 2. Our holding in *Loeb v. Rasmussen*

The litigation in *Loeb v. Rasmussen* arose from events that transpired on June 25, 1983.[56] The Cushman Boxboy (Boxboy), a liquor store in Fairbanks, sold alcohol to Teresa Bouffioux, a minor, and another minor without asking either customer to furnish proof of age.[57] Bouffioux then drove a car and was injured in a one-car accident.[58] She was charged with driving while intoxicated after a blood sample revealed a blood alcohol level of 0.15.[59] Approximately one year later, Bouffioux committed suicide.[60] The personal representative of her estate sued Leo Rasmussen and L & L Investments, doing business as Boxboy, for damages related to Bouffioux's injuries and her ultimate death.[61]

Boxboy argued that our judicial adoption of comparative negligence should apply and allow an allocation of fault to Bouffioux.[62] Boxboy was unable to rely on Alaska's tort reform statutes because the claims in *Loeb* accrued in 1983 and possibly 1984, before the legislature's codification of comparative negligence in 1986 and before the ballot initiative enacting pure several liability in 1988.[63]

We rejected Boxboy's argument after determining that AS 04.21.020, a statute allowing (but not providing) civil liability for liquor licensees who furnish alcohol to persons under twenty-one, was an "exceptional statute" designed to protect minors.[64] We recognized that the application of comparative negligence was in tension with Alaska's policy against underage drinking.[65] We concluded, after canvassing other jurisdictions,[66] that the benefit of applying our system of comparative negligence was outweighed by the risk of undermining Alaska's policy against underage drinking. However, we specifically declined to rule on the implications of the 1988 voter initiative which enacted our current scheme of pure several liability.[67]

### 3. AS 04.21.020 is no longer an "exceptional statute" in light of the enactment of pure several liability.

We have previously recognized that a system of comparative negligence can coexist

---

**53.** *Petrolane Inc. v. Robles*, 154 P.3d 1014, 1019 (Alaska 2007); *Kodiak Island Borough v. Roe*, 63 P.3d 1009, 1013 (Alaska 2003). The 1986 statute also underwent some minor and largely cosmetic legislative changes in 1988. *Compare* AS 09.17.080 *with* Former AS 09.17.080.

**54.** *Petrolane Inc.*, 154 P.3d at 1019 n. 12.

**55.** AS 09.17.080(a)(2), (c), & (d).

**56.** 822 P.2d 914, 916 (Alaska 1991).

**57.** *Id.*

**58.** *Id.*

**59.** *Id.*

**60.** *Id.*

**61.** *Id.*

**62.** *Id.* at 917–18.

**63.** Laws passed by the legislature generally do not affect pre-enactment conduct. Alaska Const. art. 2, § 18; *see also Ogle v. Craig Taylor Equip. Co.*, 761 P.2d 722, 725 (Alaska 1988). Though *Loeb* referenced the 1986 codification of comparative negligence, *Loeb*, 822 P.2d at 918–19, and the 1988 voter initiative, *id.* at 920 n. 15, that discussion was merely dicta.

**64.** *Loeb*, 822 P.2d at 918.

**65.** *Id.* at 919.

**66.** *Id.* at 918–19 & nn. 8 & 10.

**67.** *Id.* at 920 n. 15.

with either joint and several liability or pure several liability.[68] However, the choice between joint and several liability and pure several liability is ultimately a choice between two fundamentally different policies. Accordingly, this case requires us to consider whether AS 04.21.020 still represents an "exceptional statute" in light of Alaska's most recent tort reform initiatives.

■ Before assessing the continued vitality of our designation of AS 04.21.020 as an exceptional statute, it is important to understand the process that ultimately leads to this designation. A statute is not found to be "exceptional" merely by examining it in a vacuum. Rather the "exceptional" designation is the result of an analysis of two applicable but competing policies. A statute is found "exceptional" when a court determines that the policy goals of one statute are so compelling that the risk the application of another statute poses of undermining those goals becomes unacceptable.[69] Under these circumstances, a court deems the former statute "exceptional" so as to avoid application of the latter statute.

### a. The exceptional statutes doctrine is in harmony with joint and several liability but is in tension with pure several liability.

■ The primary purpose of the doctrine of joint and several liability, the type of liability that applied in *Loeb,* is to make the plaintiff whole. Joint and several liability achieves this goal by allocating the risk of a judgment-proof or otherwise immune defendant to other co-defendants. Thus, the doctrine represents a social policy choice of making a plaintiff whole over any concerns that excessive liability could be imposed on an individual defendant.

■ The primary purpose of pure several liability is to shield an individual defendant from liability in excess of the defendant's relative fault. This system thus places the risk of a judgment-proof or otherwise immune defendant on the plaintiff. As a result, it does not provide as strong a guarantee of full compensation for a plaintiff as a system of joint and several liability. But by sacrificing this policy goal, pure several liability cabins the liability imposed on an individual defendant. It does so in a number of ways. First, it blunts the effectiveness of "shotgun" pleading, whereby a plaintiff sues wealthy defendants who may be only marginally responsible for the plaintiff's injury. Second, it prevents the use of wealthy defendants as social insurers against the full loss suffered by a plaintiff. Finally, and most fundamentally, it implements the notion that a defendant should only pay for the defendant's fair share of damages.

A system of joint and several liability does not conflict with the conclusion reached in *Loeb* that AS 04.21.020 represents an exceptional statute. Joint and several liability emphasizes making the plaintiff whole. The exceptional statutes doctrine works toward this same goal by making the liquor provider liable not only for its conduct but also for the impaired patron's subsequent conduct.

■ But Alaska's current system of pure several liability conflicts with the exceptional statutes doctrine and does not support a finding that AS 04.21.020 is an exceptional statute. The exceptional statutes doctrine violates the three methods by which pure several liability is meant to cabin an individual defendant's liability. First, the doctrine encourages a minor to sue the liquor provider even if the liquor provider's culpability was minuscule relative to the minor's fault. Even where a minor's behavior was exceedingly egregious, a jury may find a liquor provider at least partially at fault for damages resulting from the minor's intoxication. Second, it effectively causes the liquor provider to provide insurance for all of the minor's conduct after furnishing alcohol. But if

---

68. *See Arctic Structures, Inc. v. Wedmore,* 605 P.2d 426, 431–34 (Alaska 1979).

69. *See* William L. Prosser, *Contributory Negligence as Defense to Violation of Statute,* 32 MINN L.REV. 105, 118–23 (1948); *see generally* RESTATEMENT (SECOND) OF TORTS § 483 cmt. c (1965) (defining "exceptional statutes" in the context of contributory negligence); *Schooley v. Pinch's Deli Mkt., Inc.,* 80 Wash.App. 862, 912 P.2d 1044, 1048–49 (1996) ("[T]he protected class is defined according to social policy.").

the minor leaves the premises, the provider has no ability to control the minor's subsequent decisions. Finally, and most importantly, the exceptional statutes doctrine creates immunity for one party who is at fault. The liquor provider must pay not only for its share of damages but also for damages attributable to the minor. This creates the exact problem of immunity [70] that drove tort reform toward pure several liability—by definition, the exceptional statutes doctrine means that one defendant will be paying damages attributable to someone else's irresponsibility. Thus, the determination in *Loeb* that AS 04.21.020 is an exceptional statute is in direct conflict with the policies underlying the voters' adoption of pure several liability.

We must therefore determine if the exceptional statute designation should survive this inherent conflict with pure several liability. Notably, this case does not involve conflicting statutes. Alaska Statute 09.17.080 unequivocally adopts several liability. Alaska Statute 04.21.020 does not expressly create any exceptions to standard rules of liability. Rather, *Loeb* went beyond the statutory text and reached a holding that we thought best effectuated the statute's underlying policy. There is no textual conflict between the statutory provisions of AS 09.17.080 and AS 04.21.020. The only conflict arises when we attempt to extend and implement the policies that those statutes represent.

Adopting the Walker and Vaughn plaintiffs' position would require that we diverge from AS 09.17.080 to pursue the policy supporting AS 04.21.020. This path would require us to abandon the policy goals of AS 09.17.080: ensuring individual responsibility and shielding defendants from unfair liability. However, adopting DelRois's position would allow us to follow AS 09.17.080 and AS 04.21.020 while still, as discussed below, effectuating much of the policy underlying AS 04.21.020.[71]

### b. Other jurisdictions' experiences support our conclusion that comparative negligence with pure several liability is consistent with Alaska's policy against underage drinking.

Because minors are unable to meaningfully assess the risks associated with the use of alcohol, Alaska has a long-standing, strong policy against underage drinking.[72] *Loeb* was decided, in part, as an effort to effectuate this policy.[73] The rule in *Loeb* carries out this policy by creating a strong incentive for liquor licensees to comply with the law.

However, adopting comparative negligence with pure several liability is consistent with achieving Alaska's public policy against underage drinking. Comparative negligence does not absolve the liquor licensee of liability.[74] The trier of fact will consider the vendor's actions when allocating fault between the minor and the vendor.[75] The trier of fact will also consider the minor's actions and the minor's age, maturity, and ability, or lack

70. Immunity can either be granted legally, as is done via the exceptional statutes doctrine, or it can exist as a practical matter, as is found in the case of judgment-proof defendants.

71. Because an application of comparative negligence harmonizes the policy concerns expressed by the competing statutes and avoids a conflict of statutes, we need not address the rule of statutory construction that a specific statute applies over a general statute. *See Nat'l Bank of Alaska v. State, Dep't of Revenue*, 642 P.2d 811, 817–18 (Alaska 1982).

72. We discussed this policy in *Loeb*, 822 P.2d at 919 & nn. 11–12.

73. *Id.* at 919; *see also id.* at 917 (quoting *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979)).

74. Apart from liability in tort, the liquor licensee could face sanctions against its license or even

criminal charges. *See* AS 04.11.370; AS 04.11.535(b); AS 04.21.030.

75. This point belies any argument that a comparative negligence rule gives a vendor an incentive to break the law brazenly, serving a patron until the patron is exceedingly inebriated. Though the negligence of such a patron would be a cause of any harmful behavior while intoxicated, the bar would also be negligent for its purveyance of large quantities of alcohol. Moreover, such a situation might support an award of punitive damages for reckless behavior on the part of the bar. *See* AS 09.17.020. We note that the Walker and Vaughn plaintiffs sought punitive damages, alleging that DelRois was reckless in providing alcohol. The jury, however, declined to award punitive damages.

thereof, to appreciate the risks of alcohol use.[76]

All states have a strong policy against underage drinking. And yet, as discussed below, many use comparative fault in cases such as this. We also recognize that some courts have taken added steps to bolster the policy against underage drinking while simultaneously applying comparative negligence. For example, the New Jersey Supreme Court encourages the use of special jury instructions regarding the allocation of fault between a minor and dram shop in an effort to more fully address this public policy concern.[77]

### 4. The precedents cited in *Loeb* no longer have persuasive force.

*Loeb* was decided at a time when states were divided in their treatment of a vendor's liability to a minor who purchased and consumed alcohol from the vendor.[78] Some held that comparative fault principles should be applied to dram shop litigation brought by a minor. Others refused to allocate fault to a

minor. With time, many states have revisited this topic. A reexamination of the persuasive precedents from Iowa, Louisiana, Minnesota, and Florida on which *Loeb* relied[79] reveals a general erosion of support for the position we adopted in *Loeb*. A broader canvassing of jurisdictions confirms that our holding in *Loeb* now represents the minority view.

The Iowa Supreme Court determined in *Slager v. HWA Corp.*[80] that "the [Iowa] legislature did not intend comparative fault to be a defense to a dram shop action."[81] But this language must be read in light of the fact that Iowa's dram shop liability statute is "meant to protect only those who have not participated in the intoxicated person's intoxication by their complicity or assumption of risk."[82] A person who purchases alcohol from a dram shop is not an "innocent person" who falls within the absolute protection of Iowa's statute.[83] In Iowa, a vendor can assert a minor's complicity or assumption of risk, and thus bar any recovery by the injured minor, even though the vendor illegally sold alcohol to the minor.[84]

---

**76.** The jury considered those factors in this case. The jury was instructed to allocate fault among the parties and a number of other persons, but, at the urging of the Walker and Vaughn plaintiffs, the jury was not informed that fault allocated to Walker and Vaughn would be charged to DelRois. During closing arguments counsel for the Walker plaintiffs told the jury it could allocate fault to Walker and Vaughn, and counsel for the Vaughn plaintiffs told the jury that DelRois was not the only party at fault and that Vaughn himself was at fault to some degree. Evidence had been presented that Walker and Vaughn were seventeen and knew it was illegal for them to purchase and consume alcohol; Vaughn nonetheless purchased alcohol from DelRois and both of them consumed it and shared it with another minor; and then Vaughn, Walker, and the other minor all rode on a single four-wheeler, with Vaughn driving. The jury's allocation of fault, weighted heaviest against DelRois, lower against Vaughn, and least against Walker, is consistent with the evidence and the concessions by the Walker and Vaughn plaintiffs. It also answers any argument that in cases like this one juries will as a matter of course allocate virtually all of the fault to the intoxicated minors. It is true that had the Walker and Vaughn plaintiffs known the jury's allocation of fault actually would be effective, they may have made different tactical decisions and closing arguments. But the trial court made it clear to the Walker and Vaughn plaintiffs that they bore the risk of any successful challenge to the procedure they urged and the trial court ultimately accepted.

**77.** *See, e.g., Steele v. Kerrigan,* 148 N.J. 1, 689 A.2d 685, 701 (1997).

**78.** *Loeb,* 822 P.2d at 919 & n. 10.

**79.** *See id.* (citing as "[c]ases refusing to apply comparative fault principles to dram shop actions" *Booth v. Abbey Rd. Beef & Booze, Inc.,* 532 So.2d 1288, 1290 (Fla.App.1988); *Slager v. HWA Corp.,* 435 N.W.2d 349, 351–54 (Iowa 1989); *Chausse v. Southland Corp.,* 400 So.2d 1199, 1202 (La.App.1981); *Keenan v. Hydra–Mac, Inc.,* 422 N.W.2d 741, 744–45 (Minn.App.1988), *rev'd on other grounds,* 434 N.W.2d 463 (Minn.1989)).

**80.** 435 N.W.2d 349 (Iowa 1989).

**81.** *Id.* at 352.

**82.** *Martin v. Heddinger,* 373 N.W.2d 486, 488 (Iowa 1985). In Iowa the dram shop act provides the exclusive remedy against a liquor licensee. *Slager,* 435 N.W.2d at 352, 354.

**83.** Iowa Code § 123.92 (2007); *Slager,* 435 N.W.2d at 351–52; *Berge v. Harris,* 170 N.W.2d 621, 625 (Iowa 1969).

**84.** *See Martin,* 373 N.W.2d at 489 ("Two reasons for the rule expressed in the cases are that one

The Louisiana case cited for support in *Loeb* was decided based on contributory negligence,[85] but Louisiana now follows a scheme of comparative negligence.[86] Under Louisiana's current law, a liquor provider's liability for an illegal sale of alcohol to a minor is governed by Louisiana's general rules of negligence.[87] Though no appellate court has ruled on the point, it is clear that lower courts are allowing the consideration of a minor's comparative fault in actions brought against the vendor.[88]

*Loeb* also cited an analogous Minnesota case considering Minnesota's Child Labor Standards Act.[89] The cases on which the Minnesota court relied, however, were based on contributory negligence.[90] These authorities are largely inapplicable given Alaska's adoption of comparative negligence. Moreover, the Minnesota legislature "has explicitly made dram shop liability subject to comparative fault,"[91] and a Minnesota court of appeals has applied comparative fault principles in a suit brought by a minor against an alcohol provider for damages the minor incurred after becoming intoxicated.[92]

Of the four jurisdictions we relied on in *Loeb*, only Florida appears to have retained a general rule barring the consideration of an intoxicated minor's negligence when the minor sues the dram shop. However, Florida, unlike Alaska, only provides for liability if the vendor's sale to the minor was willful.[93]

We also find that the Alaska precedents cited in *Loeb* have lost their value in light of Alaska's recent tort reforms. *Loeb* and its predecessors cited *Vance v. United States*,[94] from the federal district court in Alaska, as persuasive authority.[95] In *Vance*, the district court considered a suit brought by an intoxicated adult against a club that served him too much alcohol.[96] Though no prior cases discussed the issue, the *Vance* court assumed that AS 04.15.020(a), the predecessor to AS 04.21.020, was an exceptional statute designed to protect minors.[97] The court reasoned that the statutory treatment of intoxicated adults should be analogous to the presumed treatment of minors.[98] Accord-

---

cannot profit from his own wrong and a person who participates in the drinking activities is not an innocent person entitled to protection under the dramshop act." (quoting *Berge*, 170 N.W.2d at 625)). In no sense did *Slager* overrule *Martin* or *Berge*. In *Cox v. Rolling Acres Golf Course Corp.*, 532 N.W.2d 761 (Iowa 1995), the Iowa Supreme Court cited all three cases for the proposition that "[c]omplicity on the part of the injured party is an absolute bar to recovery under [the dram shop act]." *Id.* at 763–64.

**85.** *See Chausse v. Southland Corp.*, 400 So.2d 1199, 1202–03 (La.App.1981).

**86.** The Louisiana legislature enacted a rule of comparative negligence that has been in effect since 1980. *See Dumas v. State ex rel. Dep't of Culture, Recreation & Tourism*, 828 So.2d 530, 532–33 (La.2002). Though *Chausse* was decided in 1981, the court only discussed contributory negligence, presumably because the cause of action accrued before the effective date of the enactment of comparative negligence.

**87.** *Berg v. Zummo*, 786 So.2d 708, 718 (La.2001).

**88.** *See id.*, at 711–12, 716 (discussing an allocation of fault in a suit brought by a third party between an intoxicated minor and the bar that served the minor alcohol); *Colgate v. Mughal Bros.*, 836 So.2d 1229, 1232 (La.App.2003) (noting that the trial court reduced the award of damages by the minor's comparative fault).

**89.** *See Loeb v. Rasmussen*, 822 P.2d 914, 919 n. 10 (Alaska 1991) (citing *Keenan v. Hydra–Mac, Inc.*, 422 N.W.2d 741 (Minn.App.1988), *rev'd on other grounds*, 434 N.W.2d 463 (Minn.1989)).

**90.** *Keenan*, 422 N.W.2d at 744–45 (citing *Dusha v. Va. & Rainy Lake Co.*, 145 Minn. 171, 176 N.W. 482, 483 (1920); *Zerby v. Warren*, 297 Minn. 134, 210 N.W.2d 58, 62 (1973)).

**91.** *VanWagner v. Mattison*, 533 N.W.2d 75, 79–80 (Minn.App.1995).

**92.** *See id.* at 76, 79–80.

**93.** *See Publix Supermarkets, Inc. v. Austin*, 658 So.2d 1064, 1066–67 (Fla.App.1995).

**94.** 355 F.Supp. 756 (D.Alaska 1973).

**95.** *See Loeb v. Rasmussen*, 822 P.2d 914, 918 (Alaska 1991) (citing *Vance*, 355 F.Supp. 756); *see also, e.g., Morris v. Farley Enters., Inc.*, 661 P.2d 167, 170 (Alaska 1983) (citing *Vance*, 355 F.Supp. at 760).

**96.** *Vance*, 355 F.Supp. at 758–59.

**97.** *Id.* at 759–60.

**98.** *Id.*

ingly, *Vance* was the first case in Alaska to hold that AS 04.15.020(a) was an exceptional statute designed to protect intoxicated adults and minors and thus that a vendor could not invoke such a person's negligence as a defense.[99] However, *Vance* was decided when Alaska was a contributory negligence jurisdiction.[100] The exceptional statutes doctrine has more effect in a contributory negligence regime because contributory negligence is an absolute defense to liability. Thus, a liquor licensee could invoke contributory negligence, thereby absolving itself of civil liability for illegally selling to a minor or an intoxicated adult, undermining the legislature's intent of preventing minors from gaining access to alcohol.

In addition to noting the erosion of the authority cited in *Loeb*, we also note that the rule represented by *Loeb* has been subsequently rejected by other jurisdictions. For example, the Utah Supreme Court overruled its prior decision in line with *Loeb* in favor of a comparative negligence system.[101] The New Mexico Supreme Court, in a discussion that specifically rejected *Loeb*, reasoned that legislative adoption of comparative fault should apply in similar situations.[102] Many jurisdictions now apply comparative negligence in cases involving a minor's alcohol use.[103]

### 5. Summary

We designated AS 04.21.020 an exceptional statute in light of the precedent and policy

99. *See id.* at 760–61.

100. *See id.*

101. *See Red Flame, Inc. v. Martinez*, 996 P.2d 540, 543–44 (Utah 2000) (overruling *Reeves v. Gentile*, 813 P.2d 111 (Utah 1991)).

102. *Reichert v. Atler*, 117 N.M. 623, 875 P.2d 379, 381–82 (1994); *see also Barth v. Coleman*, 118 N.M. 1, 878 P.2d 319, 321–22 (1994) (reaffirming *Reichert* ).

103. *See, e.g., Tobin v. Norwood Country Club, Inc.*, 422 Mass. 126, 661 N.E.2d 627, 634 (1996); *Munford, Inc. v. Peterson*, 368 So.2d 213, 219 (Miss.1979); *Bissett v. DMI, Inc.*, 220 Mont. 153, 717 P.2d 545, 547 (1986); *Steele v. Kerrigan*, 148 N.J. 1, 689 A.2d 685, 701 (1997); *Busby v. Quail Creek Golf & Country Club*, 885 P.2d 1326, 1333–34 (Okla.1994); *Cook ex rel. Uithoven v. Spinnaker's of Rivergate, Inc.*, 878 S.W.2d 934, 938–39 (Tenn.1994); *Matthews v. Konieczny*, 515 Pa. 106, 527 A.2d 508, 512 (1987) (citing *Congini ex rel. Congini v. Portersville Valve Co.*, 504 Pa. 157, 470 A.2d 515, 518–19 (1983) (social host can assert minor's comparative fault)); *Schooley v. Pinch's Deli Mkt., Inc.*, 134 Wash.2d 468, 951 P.2d 749, 756 (1998); *Anderson v. Moulder*, 183 W.Va. 77, 394 S.E.2d 61, 70–71 (1990). These cases include actions brought by the minor against the vendor and actions brought by a third party against the vendor.

In some jurisdictions, the vendor, either by statute or common law rule, is immune from liability resulting from injuries related to the sale of alcohol to a minor. These cases, accordingly, demonstrate an even greater departure from our holding in *Loeb. See Strang v. Cabrol*, 37 Cal.3d 720, 209 Cal.Rptr. 347, 691 P.2d 1013, 1016 (1984) (recognizing that the legislature only allowed liability if a vendor serves alcohol to an obviously intoxicated minor); *Oakes v. Megaw,*

565 A.2d 914, 916–17 (Del.1989); *Winters v. Silver Fox Bar*, 71 Haw. 524, 797 P.2d 51, 53–54, 57 (1990); *Ling v. Jan's Liquors*, 237 Kan. 629, 703 P.2d 731, 735–39 (1985); *Craig v. Larson*, 432 Mich. 346, 439 N.W.2d 899, 904 (1989); *Pelzek v. Am. Legion*, 236 Neb. 608, 463 N.W.2d 321, 323–24 (1990); *Reuter v. Flobo Enters., Ltd.*, 120 A.D.2d 722, 503 N.Y.S.2d 67, 68 (N.Y.App.Div. 1986); *Kirchner v. Shooters on the Water, Inc.*, 167 Ohio App.3d 708, 856 N.E.2d 1026, 1029, 1038 (2006); *Meier ex rel. Meier v. Champ's Sports Bar & Grill, Inc.*, 241 Wis.2d 605, 623 N.W.2d 94, 101–02 (2001).

Other jurisdictions have not ruled in a case involving a vendor's sale of alcohol to a minor but have addressed a social host's liability to a minor. The following cases hold that a social host can assert the minor's comparative negligence or that a social host has no liability whatsoever. *Mowell v. Marks*, 269 Ga.App. 147, 603 S.E.2d 702, 704 (2004) (holding no liability and construing Georgia Code Ann. § 51–1–40 (West 2007), which applies equally to social hosts and vendors); *Nisbet v. Bucher*, 949 S.W.2d 111, 116–17 (Mo.App.1997) (comparative negligence); *Hickingbotham v. Burke*, 140 N.H. 28, 662 A.2d 297, 301–02 (1995) (comparative negligence under common law); *Daniels v. Carpenter*, 62 P.3d 555, 561–62 (Wyo.2003) (comparative negligence).

Other jurisdictions have not ruled in a case involving a minor but have considered the consumer's fault in cases involving an adult's intoxication. *See, e.g., Del E. Webb Corp. v. Superior Court*, 151 Ariz. 164, 726 P.2d 580, 584–86 (1986); *Lyons v. Nasby*, 770 P.2d 1250, 1259 (Colo.1989); *Idaho Dep't of Labor v. Sunset Marts, Inc.*, 140 Idaho 207, 91 P.3d 1111, 1115, 1117 (2004); *Stewart v. Ryan*, 520 N.W.2d 39, 46 (N.D.1994); *Fulmer v. Timber Inn Rest. & Lounge, Inc.*, 330 Or. 413, 9 P.3d 710, 717 (2000); *F.F.P. Operating Partners v. Duenez*, 237 S.W.3d 680, 689–90 (Tex.2007).

that existed at the time of *Loeb*. However, Alaska's most recent tort reform—rejecting joint and several liability and enacting pure several liability in AS 09.17.080—changed one of these foundational policies. An examination of this new statute convinces us that the exceptional statute designation cannot coexist with the clear policy underlying AS 09.17.080.[104] Our review of other jurisdictions supports our conclusion that the holding in *Loeb* is from an earlier era. We therefore hold that our earlier determination that AS 04.21.020 was an exceptional statute not subject to comparative negligence has been superseded by the enactment of pure several liability.

**B. The Superior Court Did Not Err by Refusing To Offset the Walker and Vaughn Plaintiffs' Award Against DelRois by the Amount that They Received in Settlements from Other Defendants.**

■ Before trial, the Walker and Vaughn plaintiffs settled their claims against Raone and Carl Bingham. Raone paid the Walker plaintiffs [105] $533,206.69 and the Vaughn plaintiffs [106] $284,006.05. Carl paid the Walker plaintiffs $504,315.24 and the Vaughn plaintiffs $312,897.70. Thus, the Binghams paid the Walker and Vaughn plaintiffs over $1.6 million to settle the plaintiffs' claims against them.

The superior court ignored this settlement when calculating the Walker and Vaughn

plaintiffs' award against DelRois. Instead, the court simply noted each claimant's damages and imposed sixty-two percent of the liability for these damages upon DelRois. For example, the jury found that the accident caused Robert Walker $330,000 in damages. The court accordingly ordered DelRois to pay Robert's estate sixty-two percent of $330,000, plus prejudgment interest, even though the estate had already received a total of $518,760.96 from the settlements with the Binghams.[107]

DelRois argues that the superior court erred by not reducing the Walker and Vaughn plaintiffs' award against DelRois by the amount that the Walker and Vaughn plaintiffs received in their settlement with the Binghams. DelRois relies on the common law policy that precludes plaintiffs from receiving double recoveries, quoting this court's reference to "the common law rule embodying the sound public policy of permitting a plaintiff to receive only the amount of his adjudged damages and no more, regardless of the source of the recovery." [108] But we held in *Petrolane Inc. v. Robles*[109] that "the rule against double recovery is grounded in joint and several liability" and does not apply in the context of pure several liability.[110] We reached this conclusion in part because AS 09.17.080 mandates the court to "enter judgment against each party liable on the basis of several liability in accordance with that party's percentage of fault." [111] We also relied on policy reasons—encouraging

---

104. We also note that the current version of AS 09.65.210 precludes a person or his personal representative from recovering damages for his personal injury or death if the injury or death occurred while the person was operating a motor vehicle while under the influence of intoxicating liquor. *See* AS 09.65.210(4) and (5). Although this statute became effective after this case accrued and thus does not apply to this case, *see* ch. 26, § 31, SLA 1997, it too is inconsistent with continued treatment of AS 04.21.020 as an exceptional statute.

105. The settlement agreements with Raone and Carl defined the Walker plaintiffs to include the Estate of Robert Walker, William Walker, Donna Walker, Glenna Weeks, Rhonda Walker, Katie Walker, and Jonathan Walker.

106. The settlement agreements with Raone and Carl defined the Vaughn plaintiffs to include the

Estate of Justin Vaughn, Donald Vaughn, and Donna Vaughn.

107. The Estate of Robert Walker received fifty percent of the Walker plaintiffs' settlements with the Binghams.

108. *Tommy's Elbow Room, Inc. v. Kavorkian*, 754 P.2d 243, 246 (Alaska 1988) (quoting *Layne v. United States*, 460 F.2d 409, 411 (9th Cir.1972)) (internal quotation marks omitted).

109. 154 P.3d 1014 (Alaska 2007).

110. *Id.* at 1019–20; *see also Diggins v. Jackson*, 164 P.3d 647, 648 (Alaska 2007) (following *Petrolane*).

111. AS 09.17.080(d); *Petrolane*, 154 P.3d at 1019.

settlement and avoiding windfalls to nonsettling defendants—and followed the precedent established in most other pure several liability jurisdictions and section 16 of the Restatement (Third) of Torts.[112] In light of our decision in *Petrolane*, we must reject DelRois's argument seeking a credit for the pretrial settlements.[113]

## C. Witnesses Eric DuBois, Michael Poirier, and Andrew Dousette

At trial, the Walker and Vaughn plaintiffs presented the testimony of Eric DuBois, Michael Poirier, and Andrew Dousette. Each witness testified that he had purchased alcohol from DelRois while underage and that DelRois had not carded him before these purchases. They all testified that they knew that DelRois sold alcohol to minors. Additionally, Andrew Dousette testified that he witnessed Justin Vaughn purchase and consume alcohol from DelRois the evening of the accident.

DelRois objected to the use of each witness. DelRois argued that the Walker and Vaughn plaintiffs had not notified DelRois of these witnesses until the eve of trial. DelRois contended that it had insufficient time to prepare for each witness. The superior court overruled these objections and allowed each witness to testify.

On appeal DelRois again argues that it had insufficient notice of these witnesses. Additionally, DelRois now argues that the testimony of these witnesses was inadmissible.

### 1. The superior court did not abuse its discretion when it allowed the testimony of Eric DuBois, Michael Poirier, and Andrew Dousette.

The Walker and Vaughn plaintiffs were unable to notify DelRois of their intent to present Eric DuBois, Michael Poirier, and Andrew Dousette as witnesses until the eve of trial, February 12, 2004. At trial, Eric DuBois explained that he worked for Robert Walker's father, William, and did not inform William until February 10 of his experience

with DelRois. DuBois stated that he overheard William discussing this suit on the phone and volunteered the information about DelRois. Michael Poirier testified that he was the fiancé of Rhonda Walker, Robert Walker's sister, and stated that he did not bring his experience with DelRois to the Walkers' attention until two weeks before trial. The Walker and Vaughn plaintiffs were aware of Andrew Dousette early on in the litigation and included him on the witness list. However, they were unable to locate him until immediately before trial, at which point the Walker and Vaughn plaintiffs hired a private investigator to find Dousette. The plaintiffs notified DelRois immediately after they became aware of each witness.

The superior court's original scheduling order required the parties to submit their final witness lists by August 2000, two months before the then-scheduled trial date, but the superior court nevertheless allowed the testimony of these late-introduced witnesses. The court found that the Walker and Vaughn plaintiffs could not have secured these important witnesses sooner and had diligently notified DelRois as soon as possible. The court noted that DelRois had not used the new witnesses as a ground for a continuance motion and concluded that the late introduction of these witnesses did not significantly prejudice DelRois.

The superior court took further steps to mitigate any prejudice these witnesses might have caused DelRois. It allowed DelRois to recall these witnesses after the court had dismissed them. It permitted DelRois opportunities to speak with the witnesses privately before cross-examination. The court also assisted DelRois in discovering information it might use to impeach the witnesses' credibility, such as convictions for crimes of dishonesty. Finally, the court stated that it would entertain motions from DelRois for attorney's fees if DelRois could show that the tardy introduction of these witnesses caused DelRois additional expense.

---

**112.** *Petrolane*, 154 P.3d at 1020–21.

**113.** Just as a defendant should not have to pay more than its share calculated under AS

09.17.080(d)—as we hold *supra* on pages 1155–56—*Petrolane* established that a defendant

DelRois appeals the superior court's decision to allow these witnesses to testify. The Walker and Vaughn plaintiffs answer that the trial court appropriately considered the costs and benefits of allowing them to testify.

■ We review a trial court's decision to depart from a pretrial discovery schedule for an abuse of discretion.[114] We also review for abuse of discretion a trial court's choice of a particular sanction for a discovery violation.[115]

The Alaska Rules of Civil Procedure provide the process by which parties notify each other of witnesses that they intend to present at trial. Under these rules, the trial court may establish deadlines after which parties generally may not add new witnesses.[116] Civil Rule 16(e) states that courts may only modify these deadlines to prevent "manifest injustice."

■ Trial courts are afforded broad discretion to determine whether a situation entails a "manifest injustice" sufficient to justify departure from pretrial scheduling orders.[117] In making such a determination, courts should consider several factors, including the prejudice to the opposing party, the importance of the evidence to the party seeking to introduce it, and whether that party could have more diligently obtained that evidence with earlier notice.[118]

After reviewing the record as a whole and analyzing the factors relevant to manifest injustice, we conclude that the superior court did not abuse its discretion by deviating from its pretrial witness order. The superior

court reasonably found that the danger of surprise or prejudice to DelRois was small.[119] Moreover, as explained above, the court took steps to minimize any prejudice that might have occurred. It also found that the witnesses would provide probative testimony for the Walker and Vaughn plaintiffs regarding the likelihood that alcohol from DelRois was consumed on the night of the accident and that the witnesses could not have been secured with greater diligence.

For the same reasons, DelRois's alternative argument that the superior court erred by not precluding the testimony of witnesses introduced in violation of its discovery order also fails. Civil Rule 37 grants courts broad discretion to fashion remedies for discovery order violations, including the option of excluding evidence procured in violation of a discovery order.[120] In fashioning such remedies, Rule 37 commands courts to consider the nature and severity of the violation, the prejudice to the opposing party, and any other factors it deems appropriate. Preclusion of witness testimony is a harsh remedy, appropriate only if noncompliance is severe or willful.[121] As explained above, the superior court appropriately considered the prejudice to DelRois, the importance of the testimony, and the diligence with which the Walker and Vaughn plaintiffs procured these witnesses.

### 2. The content of the testimony did not create reversible error.

The Walker and Vaughn plaintiffs used the testimony of Eric DuBois, Michael Poirier,

should not be permitted to pay less than its share.

**114.** *City of Kotzebue v. McLean*, 702 P.2d 1309, 1316 (Alaska 1985).

**115.** *Hughes v. Bobich*, 875 P.2d 749, 752 (Alaska 1994).

**116.** Alaska R. Civ. P. 16(b) & 26.

**117.** *See McLean*, 702 P.2d at 1316.

**118.** *Howard S. Lease Constr. Co. & Assocs. v. Holly*, 725 P.2d 712, 720 (Alaska 1986) (quoting 6 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1527, at 611–12 (1st ed.1971)).

**119.** As explained in the following subsection, DelRois only objected to the Walker and Vaughn

plaintiffs' presentation of these witnesses on such short notice. At trial, DelRois appeared to consent to the admissibility of their testimony to prove that it provided alcohol to minors.

**120.** *See Sykes v. Melba Creek Mining, Inc.*, 952 P.2d 1164, 1169 & n. 7 (Alaska 1998).

**121.** *Id.* at 1169–70. DelRois cites *State v. Guinn*, 555 P.2d 530, 543 (Alaska 1976), and *Hodges v. Mock*, 501 P.2d 1355, 1359 (Alaska 1972), for the proposition that we have upheld the exclusion of testimony even if there was no willful failure by a party to comply with the trial court's discovery order. However, both of those cases came to us in a different procedural posture. In both cases we determined that the trial court acted within its discretion by limiting newly developed testimony. *Guinn*, 555 P.2d at 543; *Hodges*, 501 P.2d at 1359.

and Andrew Dousette to support the proposition that DelRois sold alcohol to the decedents on the night of the accident. This testimony supported their theory of punitive damages because, if true, it demonstrated reckless behavior by DelRois. The Walker and Vaughn plaintiffs also used this testimony to rebut Rose Sowinski's anticipated testimony that DelRois does not sell alcohol to minors.[122]

DelRois challenges the admissibility of this testimony on appeal. It argues that the only possible purpose of this testimony was to prove that DelRois sold alcohol to the decedents on the night of their accident. DelRois argues that the testimony constituted impermissible character evidence because it was evidence of DelRois's past behavior and was used by the Walker and Vaughn plaintiffs to show conformity therewith on the night of the accident. DelRois further asserts that this testimony prejudiced its case.

The Walker and Vaughn plaintiffs answer that the superior court properly admitted the testimony. They argue that the testimony rebutted DelRois's argument that it consistently carded patrons and did not provide alcohol to minors. The Walker and Vaughn plaintiffs also argue that this testimony was relevant to their claim for punitive damages. As they argued at trial, they sought to use DelRois's pattern of conduct as evidence that DelRois sold alcohol to the decedents "with reckless indifference."

■ When the admissibility of evidence turns on a question of fact, we review

a trial court's decision on admissibility for an abuse of discretion.[123] However, when admissibility turns on a question of law, we use our independent judgment in reviewing the trial court's ruling.[124]

■ Initially, we note that DelRois did not object to the admissibility of this testimony at trial. DelRois objected only to the Walker and Vaughn plaintiffs' presentation of these witnesses on such short notice. Of course, DelRois may escape its failure to object to this testimony if its admission was plain error and if there was a "high likelihood that injustice has resulted." [125] We find no such grounds for reversal for three reasons.[126]

First, DelRois appeared to consent to the admissibility of this testimony to prove that it provided alcohol to minors, stating "if they got one or two witnesses that will say, 'Yeah, we bought at Del Rois,' that's one thing, but if they start bringing in a parade of people, then it is a whole different thing." Given this apparent consent, and the fact the now-challenged testimony is of the type that DelRois said it would not object to, DelRois has a heavy burden to convince us to follow a different path.

Second, the Walker and Vaughn plaintiffs used the testimony, in part, to show a pattern of reckless alcohol sales to minors in support of their punitive damages claim. This was permissible "other acts" evidence used to demonstrate potentially reckless behavior by DelRois.[127] The superior court did

---

**122.** DelRois, in its opening statement, asserted that it did not serve alcohol to minors and that it strictly required proof of identification. Rose Sowinski testified that "I didn't sell [alcohol] to minors." James McGill, the other co-owner, made a similar statement in testimony. The testimony of Sowinski and McGill came after that of Eric DuBois and Michael Poirier, but before that of Andrew Dousette.

**123.** *Turner v. Municipality of Anchorage,* 171 P.3d 180, 184 (Alaska 2007).

**124.** *Laidlaw Transit, Inc. v. Crouse ex rel. Crouse,* 53 P.3d 1093, 1097 (Alaska 2002).

**125.** *Wetherhorn v. Alaska Psychiatric Inst.,* 156 P.3d 371, 379 (Alaska 2007) (quoting *Martinez v.*

*Cape Fox Corp.,* 113 P.3d 1226, 1229 (Alaska 2005)).

**126.** We do not decide on the grounds that DelRois "opened the door" to this testimony because we are hesitant to find that two sentences in DelRois's opening statement suggesting that DelRois did not serve alcohol to minors were sufficient to allow for rebuttal testimony. We note that the trial court did not endorse an "opening the door" theory. The testimony of Rose Sowinski and James McGill emphasizing that DelRois did not serve to minors came after the testimony of DuBois and Poirier.

**127.** While the United States Supreme Court has limited the scope of other acts evidence that is constitutionally permissible, this case falls well within those boundaries. *See State Farm Mut.*

not give a limiting instruction to the jury about the permissible and impermissible uses of this testimony. Alaska Rule of Evidence 105 states that when evidence is admissible for one purpose but not another, the court shall restrict the evidence to its proper scope and instruct the jury accordingly—but only upon request.[128] Here, DelRois did not request a limiting instruction, and thus cannot complain that none was given.

Third, we affirm the superior court's admission of DuBois's, Poirier's, and Dousette's testimony because their testimony did not substantially prejudice DelRois. While the trial court properly found that these witnesses were important to the Walker and Vaughn plaintiffs' case, the most important components of the testimony were not general habit evidence. Rather, Andrew Dousette testified that on the evening of the accident, he witnessed Justin Vaughn purchase alcohol from DelRois. Justin Rucker, another witness at the trial, testified that he independently purchased alcohol from DelRois on the night of the accident and joined a number of his friends, including Justin Vaughn and possibly Robert Walker, at a party that night. This evidence is probative of whether DelRois sold alcohol to the decedents the night of the accident and would be sufficient to support the jury's findings that DelRois had done so. Therefore, to the extent the admission of propensity evidence was erroneous, we hold that it likely did not affect the substantial rights of the parties.[129]

### D. The Jury Instructions and Special Verdict Forms

After the close of trial, the court gave the jury written instructions and provided a set of special verdict forms. These instructions and verdict forms were the product of extended debate between the parties. DelRois claims that a number of the instructions and forms were erroneous.[130]

We review jury instructions and special verdict forms de novo.[131] To overturn a jury instruction or special verdict form, we must conclude not only that the instruction or special verdict form was legally erroneous, but also that the verdict would probably have been different but for the error.[132] Additionally, if a party fails to object to a jury instruction, we will review the challenge on appeal only for plain error.[133] Where a jury instruction or special verdict form is legally correct and the question is whether the evidence justified its use, we review the superior court's use of the instruction for an abuse of discretion.[134]

#### 1. The superior court erred by allowing the jury to award damages to the decedents for their loss of enjoyment of life.

Over DelRois's objection, the jury instructions allowed the jury to award the estates of the decedents "the value of the loss of enjoyment of life from the life the decedents would have enjoyed." The special verdict forms similarly provided for such an award. The jury awarded each estate at least $10,000 for loss of enjoyment of life.[135]

*Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 422–24, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003).

**128.** *See Geolar, Inc. v. Gilbert/Commonwealth Inc. of Mich.,* 874 P.2d 937, 942 n. 10 (Alaska 1994) ("Homer Electric was entitled to a limiting instruction explaining [that the evidence was not hearsay because it was not admitted to prove the truth of the matter asserted]. However, it did not ask for such an instruction.").

**129.** Alaska R. Evid. 103(d); Alaska R. Civ. P. 61; *Crosby v. Hummell,* 63 P.3d 1022, 1028 n. 23 (Alaska 2003).

**130.** The Walker and Vaughn plaintiffs argue that DelRois waived any challenge to the jury instructions by failing to object to them at trial, but this argument is largely without merit. We discuss this issue below when applicable.

**131.** *Cummins, Inc. v. Nelson,* 115 P.3d 536, 541 (Alaska 2005).

**132.** *Reich v. Cominco Alaska, Inc.,* 56 P.3d 18, 25 (Alaska 2002).

**133.** *Cummins, Inc.,* 115 P.3d at 541.

**134.** *Power Constructors, Inc. v. Taylor & Hintze,* 960 P.2d 20, 29 (Alaska 1998).

**135.** The exact quantity of the jury's award is unclear because the phrase "loss of enjoyment of life" was used in two places on the jury's form for each decedent. One line on the form only discussed damages for post-trial loss of enjoyment of life. Another line included loss of enjoyment of life in a list of damages under the caption of past non-economic loss.

DelRois now reasserts its challenges to this instruction and special verdict form. DelRois argues that "[t]here can be no loss of enjoyment of life after death, as that is something only a living person can experience."

■ When a plaintiff's death results from a defendant's tortious conduct, AS 09.55.580(a) allows the plaintiff, through a personal representative, to assert a claim for wrongful death and to recover any "damages the court or jury may consider fair and just." The statute not only creates a wrongful death cause of action, but also regulates the damages a court may award.[136] Subsection (a) clearly limits the damages recoverable by the estate of a decedent without dependents to pecuniary damages: "When the decedent is survived by no spouse or children or other dependents, the amount recovered shall be administered as other personal property of the decedent but shall be limited to pecuniary loss."[137] Because neither decedent had any dependents,[138] AS 09.55.580(a) limited the recovery of the estates to pecuniary harm, which does not include intangible loss of enjoyment of life.[139]

In light of our holding, the awards for both past and future non-economic loss for the Estates of Robert Walker and Justin Vaughn must be vacated. The awards for future non-economic loss were purely for the decedents' loss of enjoyment of life. While the instructions for past non-economic loss included some permissible considerations—for example, pre-death pain and suffering under the survival statute AS 09.55.570 [140]—these awards cannot be sustained because the instruction also allowed assessment of impermissible damages for the loss of enjoyment of life.

## 2. The superior court erred by instructing the jury that it could award nonpecuniary damages to Robert Walker's sister, Rhonda.

■ The superior court instructed the jury that it could "compensate each plaintiff for the sorrow, mental distress and grief that they may have suffered or will suffer because of the death of Robert Jason Walker and Justin Daniel Vaughn." DelRois's attorney objected, stating that "I don't want to belabor this, but I just want to make sure the record reflects that I object to Rhonda Walker being included here." In response, the superior court stated, "I'm permitting it based on the testimony that I heard." The jury awarded $100,000 to Rhonda for her emotional harm resulting from her brother's death.

On appeal, DelRois argues that in wrongful death cases where the decedent dies without dependents, Alaska permits only parents to recover damages for their emotional harm.

Both parties agree that Alaska law does not expressly recognize a nondependent sibling's right to recover nonpecuniary damages in a wrongful death case. As described above, the statute providing a wrongful death cause of action, AS 09.55.580, does not permit any recovery of nonpecuniary harms where the decedent dies without dependents.

Despite this statutory prohibition, the Walker and Vaughn plaintiffs argue that we should create a new common law cause of action for the siblings of wrongful death victims. We decline the Walker and Vaughn plaintiffs' invitation to create a new cause of action. Alaska Statute 09.55.580 broadly governs the recovery that may be had by the

**136.** *See Hanebuth v. Bell Helicopter Int'l,* 694 P.2d 143, 145–46 (Alaska 1984) (observing that the cause of action for wrongful death in Alaska was created by statute, not common law).

**137.** AS 09.55.580(a); *cf. Taylor v. Se.-Harrison W. Corp.,* 694 P.2d 1160, 1161–62 (Alaska 1985) (noting that the Workers' Compensation Act reflects a reasonable legislative determination that estates of decedents with dependents require greater compensation than estates of decedents without dependents).

**138.** *See In re Estate of Pushruk,* 562 P.2d 329, 331 (Alaska 1977) (defining "dependent" for pur-

poses of AS 09.55.580 as one who is actually dependent upon the decedent for support at the time of his death, such as spouses or children).

**139.** The Walker and Vaughn plaintiffs cite *Buoy v. ERA Helicopters, Inc.,* 771 P.2d 439 (Alaska 1989) to contest this conclusion. But *Buoy* is inapplicable because it involved a personal injury suit, not a wrongful death suit. *See id.* at 441, 447.

**140.** We discuss DelRois's challenge to this award *infra* at pages 1165–66.

victim of a wrongful death and by his close relatives. It unambiguously bars nondependent siblings from recovering nonpecuniary damages.[141] Alaska Statute 09.15.010, which allows nondependent parents of a wrongful death victim to recover nonpecuniary damages, is an exception to AS 09.55.580, but it does not apply to siblings of a wrongful death victim. Thus, the Alaska statutes do not allow the nondependent sibling of a wrongful death victim to assert a wrongful death claim for nonpecuniary harm.[142]

 The Walker and Vaughn plaintiffs also argue that Rhonda had a viable claim for negligent infliction of emotional distress (NIED) and thus that the superior court properly allowed her to collect damages for her emotional harm. DelRois acknowledges that Rhonda may have had a viable NIED claim. A negligent defendant breaches the standard of care owed to a plaintiff who suffers emotional harm after witnessing physical harm to her loved ones if three conditions are met: (1) the plaintiff was located near the scene of the accident; (2) the emotional harm resulted directly from observing the scene of the accident, rather than learning of it later; and (3) the plaintiff and victim were closely related.[143] We have repeatedly held that the plaintiff need not actually witness the accident and that merely witnessing an injured or dead family member at the scene of the accident is sufficient to assert an NIED claim.[144] Also, courts widely hold that siblings of the accident victim are sufficiently closely related to assert NIED claims.[145]

Here, Rhonda arrived at the scene of the accident in time to view her brother's dead body. At trial, Rhonda testified as follows:

Q. Did you say the police showed up?

A. Yeah, at 6:00 in the morning. And they told me that they needed to talk to my parents. So I told my parents, you know, that they were there and they were there about my brother. And I went to the bathroom and when I came up they were—my mom was screaming and crying and I didn't know what was going on, and they told me that he had gone into an accident and he died.

And I didn't believe them, so we went to the accident. And from the top of the hill all you could see was two bodies covered in yellow tarps. And when we walked down, I was standing over my brother and I didn't know it was him. They wouldn't let us look at him.

All I could see was his shoes. He was on his side, his left side. And Justin was under the other tarp and all I could see was blood all around where his head would be.

She also testified that she suffered emotional harm as a result, stating, "I know it has an impact on me, because I have nightmares

141. AS 09.55.580(a); *Gillispie v. Beta Constr. Co.*, 842 P.2d 1272, 1273 (Alaska 1992) ("When the decedent is not survived by dependents, the statute limits recovery to pecuniary loss.").

142. Cf. *Nickels v. Napolilli*, 29 P.3d 242, 248 (Alaska 2001) ("[T]he remedies offered by the workers' compensation statute supersede any common law remedies outside of the statutory scheme.").

143. *Beck v. State, Dep't of Transp. & Pub. Facilities*, 837 P.2d 105, 109 (Alaska 1992) (quoting *Tommy's Elbow Room v. Kavorkian*, 727 P.2d 1038, 1041 (Alaska 1986)). To recover damages, the harm suffered by the plaintiff as a result of the shock must be severe, but it does not necessarily need to result in physical illness or injury. *Chizmar v. Mackie*, 896 P.2d 196, 201–04 (Alaska 1995).

144. *See Beck*, 837 P.2d at 109–10 (holding that a plaintiff who saw her injured daughter "for the first time" in the hospital could assert an NIED claim); *Tommy's Elbow Room*, 727 P.2d at 1040, 1043 (holding that a plaintiff who arrived at the scene of a car accident in time to find his daughter injured and being removed from the car could assert an NIED claim). *But see Mattingly v. Sheldon Jackson Coll.*, 743 P.2d 356, 365–66 (Alaska 1987) (affirming the rejection of an NIED claim where plaintiff was 150 miles away when he learned of the accident injuring his son and had no "sudden sensory observation" of his injured son).

145. *See* Dale Joseph Gilsinger, Annotation, *Relationship Between Victim and Plaintiff–Witness as Affecting Right to Recover Under State Law for Negligent Infliction of Emotional Distress Due to Witnessing Injury to Another Where Bystander Plaintiff Is Not Member of Victim's Immediate Family*, 98 A.L.R.5TH 609, 621–22 (2002) ("The relationship to the victim has consistently been held adequate for bystander recovery where the plaintiff is a member of the victim's immediate family, that is, where the plaintiff is the victim's spouse, child, parent, or sibling.").

over it." Thus Rhonda may have had a viable NIED claim.

▇▇▇▇ However, the court's instructions to the jury were incorrect if Rhonda's only claim was NIED. As DelRois argues, "the special verdict form ... grouped damages for emotional distress and loss of consortium so it is impossible to determine what the jury awarded, making the entire award subject to reversal." Plaintiffs asserting NIED claims may only recover damages for their emotional harm if the harm results from a view of the injured victim soon after the accident.[146] Here, the court's special verdict forms broadly allowed the jury to award to Rhonda "Non–Economic Loss," including "emotional distress, sorrow, mental anguish and grief, loss of society, comfort, care, guidance, love, support, service and assistance, companionship and consortium." It did not distinguish between emotional harm resulting from viewing the victim at the accident scene and emotional harm resulting from Rhonda's loss of her brother.[147]

The superior court's jury instructions and special verdict forms with respect to Rhonda's emotional damages were erroneous because the jury was permitted to award Rhonda damages to which she was not entitled under an NIED theory. We accordingly vacate the award to Rhonda.

3. **The superior court erred by instructing the jury that it could award damages to the decedents' parents representing their loss of consortium for the period after the decedents would have reached the age of majority.**

▇▇▇▇ Over DelRois's objection, the superior court's special verdict form provided separate sections for the jury to award the decedents' parents nonpecuniary damages representing their losses during the periods after which the decedents would have reached the age of majority. The jury accordingly awarded $100,000 to each of the four parents for their nonpecuniary loss during this period.

DelRois argues that parents generally may recover damages for the death of their child that only represent the period of time before that child reaches the age of majority. The Walker and Vaughn plaintiffs answer that the superior court properly allowed the decedents' parents to recover nonpecuniary damages for all time periods after the accident. The Walker and Vaughn plaintiffs argue that limits on a parent's right to recover damages for the death of a child after the child would have reached the age of majority are based on the outmoded theory that parents have a right to the earnings of their minor children.

The relevant statute, AS 09.15.010, does not clearly limit the time periods for which the parents of minor children may recover loss of consortium damages. The statute provides that "[a] parent may maintain an action as plaintiff for the ... death of a child below the age of majority."[148] We have not addressed whether these damages may include loss of consortium for periods of time after the child has reached the age of majority.[149]

The policy behind AS 09.15.010 suggests that parents may not recover such damages. Indisputably, this statute does not allow a parent to recover damages resulting from the loss of a child who died during adulthood. It

---

146. *Beck,* 837 P.2d at 110–11.

147. The court did instruct the jury that it could award to Rhonda "damages for emotional distress ... suffered ... as a result of witnessing the scene of the accident." But it also instructed the jury that it could award to Rhonda "damages due to the loss of the relationship with her brother." Neither the jury instructions nor the special verdict forms properly explained that Rhonda could recover damages only under a theory of NIED, not wrongful death.

We consider DelRois's challenge to the NIED instructions below in subpart 6.

148. AS 09.15.010. As explained above, we have held that AS 09.15.010 provides an independent cause of action for parents to recover a wide variety of damages—including loss of consortium—stemming from the deaths of their children. *See Gillispie v. Beta Constr. Co.,* 842 P.2d 1272, 1273–74 (Alaska 1992).

149. *See Crosby v. Hummell,* 63 P.3d 1022, 1028 n. 23 (Alaska 2003) (declining to reach the issue of whether AS 09.15.010 allows parents to recover damages for periods after their deceased children would have reached the age of majority).

would be anomalous to allow parents whose children died while minors to recover loss of consortium damages for periods during which those children would have been adults while denying the same recovery to parents whose children died while adults.[150] Accordingly, the superior court erred by instructing the jury that it could award the decedents' parents nonpecuniary damages representing losses during the periods after which the decedents would have reached the age of majority.

### 4. The superior court did not abuse its discretion by instructing the jury that it could award the decedents' parents damages to compensate them for a loss of the decedents' "support" and "service."

 The superior court instructed the jury that it could award the parents of Robert Walker and Justin Vaughn a number of types of non-economic damages, including loss of the decedents' "support" and "service." The special verdict forms instructed the jury similarly. However, the verdict forms provided only spaces for the jury to award general non-economic damages; it did not differentiate between categories of non-economic damages. Accordingly, the jury awarded non-economic damages to each parent without specifying the particular non-economic losses for which it intended to compensate the parent.

DelRois claims that the superior court erred by instructing the jury that it could award damages for lost "support" and "service" to the plaintiffs. DelRois argues that Alaska law does not permit juries to award nonpecuniary damages for lost "support" and "service" to parents of deceased children under a "loss of society" theory. DelRois also reiterates its earlier point that the wrongful death statute, AS 09.55.580, does not permit nondependent plaintiffs to recover any pecuniary damages.

As an initial matter, DelRois's appeal on this issue pertains only to the jury's award to the decedents' parents, not its award to Rhonda. As explained above, the statute does not entitle Rhonda to any award of such damages. Moreover DelRois's appeal on this issue is relevant only to awards under AS 09.15.010 and the wrongful death statute, AS 09.55.580. Accordingly, the award to Rhonda is irrelevant to DelRois's appeal on this issue.

With regard to the remaining challenged awards, DelRois's argument is unpersuasive. As the Walker and Vaughn plaintiffs note, DelRois has waived any particular objection to an award for loss of the decedents' "support" or "service" to the parents by not making an objection on the record. Accordingly, we only review superior court's special verdict form for plain error.[151] Even if DelRois had not waived its objection, it is not clear that the inclusion of these two additional types of damages caused DelRois any prejudice.[152] The special verdict form allowed the jury to award each personal plaintiff only "Non–Economic Loss." As examples of "Non–Economic Loss," the form listed several possible categories of losses, including "emotional distress, sorrow, mental anguish and grief, loss of society, comfort, care, guidance, love, support, service and assistance, companionship and consortium." "Support" and "service" are only two of the fourteen examples of non-economic damages given by the form, and the form does not state that these examples are exhaustive. Furthermore, these are quite general examples; it is not clear how different a loss of "support" is from a loss of "companionship" and "guidance." It is unlikely that the jury's award would have differed had the superior court omitted these two examples of acceptable categories of damages.

Moreover, it would not have been a legal error for the superior court to allow the jury to award pecuniary damages to the parents of the decedents if supported by the

---

150. The statute only creates a cause of action for parents "for the injury or death of a child *below the age of majority.*" AS 09.15.010 (emphasis added).

151. *See Cummins, Inc. v. Nelson,* 115 P.3d 536, 541 (Alaska 2005) (holding that where a party

fails to object to a jury instruction at trial, this court will review the challenge only for plain error).

152. *Cf. Jackson v. Am. Equity Ins. Co.,* 90 P.3d 136, 141 (Alaska 2004).

evidence. Alaska Statute 09.15.010 creates an independent cause of action for parents to recover losses resulting from the death of their children: "A parent may maintain an action as plaintiff for the injury or death of a child below the age of majority." We have held that the broad language of the statute permits parents of deceased children to recover nonpecuniary damages.[153] Del-Rois reads our prior holding as prohibiting parents from recovering pecuniary damages under AS 09.15.010. However, the broad language of that statute and its original function—to provide parents of deceased children with pecuniary damages—contradicts this argument.

### 5. The superior court did not abuse its discretion by submitting to the jury the question of whether the decedents suffered before dying.

At trial, the Walker and Vaughn plaintiffs presented Dr. Franc Fallico, a forensic pathologist, who testified that he could not tell whether the boys had suffered any pain after their accident but before their deaths. Dr. Fallico testified that the boys died within seconds or minutes of the accident. However, he stated that he could not tell whether they were unconscious during this period and thus felt no pain, or whether they suffered greatly.

The superior court instructed the jury that it could award the decedents' estates damages as compensation for any pain the decedents suffered before they died. The special verdict form that the superior court gave the jury instructed them similarly. The jury awarded each estate $10,000 for the decedents' pain and suffering and pre-trial loss of enjoyment of life.

On appeal, DelRois claims that the superior court erred by submitting to the

jury the question of whether the decedents had suffered before dying. DelRois argues that the only evidence relating to the question of whether the decedents suffered was the testimony of Dr. Fallico, who specifically testified that he could not tell whether they did. DelRois concludes that there was insufficient evidence of the decedents' suffering to submit such a question to the jury.

The Walker and Vaughn plaintiffs answer that Dr. Fallico's testimony was sufficient evidence from which to conclude that the decedents suffered before dying. They also argue that DelRois has waived any challenge to this jury instruction by failing to object to it at trial.

As an initial matter, DelRois has waived this objection by failing to make it at trial. Accordingly, we review the superior court's special verdict form allowing for such damages only for plain error.[154]

Trial courts have broad discretion to submit questions of fact to juries. Courts need only make a threshold determination that a reasonable jury could find for either side.[155] In making such a determination, courts should view facts in the light most favorable to the party in favor of submitting the issue to the jury.[156] We review such a determination only for abuse of discretion.[157] As we have previously explained, the combination of these two standards makes it difficult for a litigant to successfully challenge a trial court's decision to submit a question to the jury: "The deferential standard of review and the substantive standard combine to give the [appellant] a difficult task in convincing us that the superior court abused its discretion."[158] The application of the plain error standard of review here compounds the challenge for DelRois on appeal.

Given this combination of standards, we conclude that the superior court acted within

---

**153.** *See Gillispie,* 842 P.2d at 1273–74.

**154.** *See Cummins, Inc.,* 115 P.3d at 541.

**155.** *See City of Bethel v. Peters,* 97 P.3d 822, 828 (Alaska 2004) (holding that the superior court should have withheld the question of whether a plaintiff had suffered severe disfigurement only if no reasonable juror could find that the plaintiff suffered severe disfigurement).

**156.** *See Pederson v. Barnes,* 139 P.3d 552, 562 (Alaska 2006).

**157.** *Peters,* 97 P.3d at 825.

**158.** *Id.* at 828.

its permissible range of discretion when it allowed the jury to determine whether the decedents had suffered before dying. Dr. Fallico's testimony evidences at least a reasonable possibility that the decedents suffered before dying. Further, the jury had an opportunity to review the evidence concerning the nature of the decedents' injuries. Based on this evidence, the jury could apply its collective knowledge and experience to the question of momentary suffering.

However, despite our determination that this instruction was not erroneous, the award of damages for pre-death pain cannot be sustained. As we have already stated, the $10,000 awards of past non-economic losses to the Estates of Robert Walker and Justin Vaughn must be vacated because they include loss of enjoyment of life damages.[159]

### 6. DelRois's challenge to the NIED instructions is unavailing.

■■■■ The superior court allowed the jury to award Robert Walker's parents, William and Donna, and sister, Rhonda,[160] and Justin Vaughn's father, Donald, emotional damages that they had incurred after viewing the scene of the accident, under an NIED claim.[161] The superior court instructed the jury that it could award the Walkers and Donald Vaughn damages for the emotional distress they experienced as a direct result of witnessing the scene of the accident. The special verdict form also provided a place for the jury to award the Walkers and Donald Vaughn such non-economic loss, although it did not distinguish between those suffered as a result of witnessing the accident scene and damages suffered as a result of losing a family member. The jury awarded each of these plaintiffs damages for their non-economic losses.

DelRois claims that the jury instructions and special verdict form were legally inadequate instructions on the requirements for an NIED claim. Specifically, DelRois argues that the court failed to instruct the jury that emotional damages, such as mental suffering and psychological injuries, must be severe to be recovered through an NIED claim.

■■■■ As an initial matter, DelRois has waived this objection by not making it at trial. In any case, the superior court instructed the jury that it could only compensate the plaintiffs for severe or serious emotional damages incurred by witnessing the accident scene. In jury instructions 28 and 29, the superior court instructed the jury that it could award "damages for emotional distress that they have suffered or will suffer as a result of witnessing the scene of the accident." Then, in jury instruction 30, the superior court instructed the jury as follows:

The term "emotional distress" means emotional distress which is severe or serious. Severe or serious emotional distress may be found where a reasonable person, normally constituted, would be unable to adequately cope with the distress caused by the circumstances of the case. Examples of serious emotional distress may include neuroses, psychoses, chronic depression, phobia, post traumatic stress disorder, and shock. However, temporary fright, disappointment, and regret do not suffice as severe or serious emotional distress.

This instruction repeats nearly verbatim language in *Chizmar v. Mackie*[162] discussing the requirement that emotional damages must be severe to be recoverable in an NIED bystander claim.[163] As such, the instructions are legally adequate.

---

159. *See supra* pages 1160–61. The award for past non-economic loss to the estates included: "pre death pain and suffering including terror and fright, and emotional distress and anguish at impending death, post death loss of enjoyment of life, to time of trial."

160. As explained above, the NIED challenge is moot as to Rhonda because the jury instructions for Rhonda's damages included nonpecuniary harms that Rhonda could not recover under a theory of NIED.

161. Witnesses of accidents may in certain circumstances recover damages for resulting emotional harm through a claim for NIED. *Beck v. State, Dep't of Transp. & Pub. Facilities,* 837 P.2d 105, 109 (Alaska 1992).

162. 896 P.2d 196 (Alaska 1995).

163. *See id.* at 204–05.

**7. The superior court did not commit plain error in its instructions regarding the present value of awards for future economic damages.**

Jury instruction 25 allowed the jury to award each estate future economic damages "in sums of present value." The special verdict form similarly allowed the jury to award such damages, but did not indicate that the damages were to be reduced to present value. The jury awarded the Estate of Robert Walker $300,000 and the Estate of Justin Vaughn $400,000 to compensate for the decedents' lost future earnings. DelRois claims that the superior court erred by failing to instruct the jury to reduce any amount it awarded to present value. DelRois notes that AS 09.17.040(b) requires a fact finder to "reduce future economic damages to present value" absent an agreement by the parties to apply the rule adopted in *Beaulieu v. Elliott.*[164]

■ DelRois did not make this objection at trial and therefore the instruction will be reviewed only for plain error. We note that jury instruction 25 indicated that the jury should reduce economic damages to present value ("economic loss ... is to be found in sums of present value"). We therefore construe DelRois's argument to be that the court inadequately instructed the jury "about inflation and reducing the award to present value with respect to future damages," not that it gave no instruction on present value. We are unable to conclude that the instruction was so inadequate as to amount to plain error. The instruction conveyed the idea that economic damages were to be calculated in terms of present value. If DelRois wanted an instruction detailing a method for calculating present value, it should have requested one.

164. *See* AS 09.17.040(b)-(c); *Beaulieu v. Elliott*, 434 P.2d 665, 671 (Alaska 1967) (holding trier of fact may "compute loss of future earnings without reduction to present value").

165. DelRois's appeal challenging the award of attorney's fees on timeliness grounds is mooted by our decision on the merits. After the various awards of damages are modified as required by

**V. CONCLUSION**

For the reasons stated:

(1) The judgment dismissing the claims against the State of Alaska is affirmed.

(2) The judgment against DelRois in favor of the Walker and Vaughn plaintiffs is vacated. On remand it should be modified to reflect DelRois's thirty-five percent fault for the accident.

(3) In addition:

(a) As to the Estate of Robert Walker, on remand the court should modify the judgment by deleting from the verdict both awards of $10,000 that include a component for loss of enjoyment of life.

(b) As to the Estate of Justin Vaughn, on remand the court should modify the judgment by deleting from the verdict both awards of $10,000 that include a component for loss of enjoyment of life.

(c) As to Rhonda Walker, the judgment is vacated.

(d) As to William and Donna Walker, on remand the court should modify their judgments by deleting the post-majority awards of non-economic damages of $100,000 in each judgment.

(e) As to Donald and Donna Vaughn, on remand the court should modify their judgments by deleting the post-majority awards of non-economic damages of $100,000 in each judgment.

(4) The awards of interest and attorney's fees are vacated. On remand the court should modify these awards as required by the changes to the judgment amounts mandated by this opinion and by the result of the partial new trial.[165]

(5) On remand under proper jury instructions:

this opinion and a partial new trial is held, a new judgment will be entered. Based on this judgment the plaintiffs will be entitled to seek an award of fees under Civil Rule 82(b) and (c) within ten days after the date shown in the clerk's certificate of distribution of the new judgment.

(a) The Estates are entitled to a new trial on their claims for pre-death pain and suffering under AS 09.55.570; and

(b) Rhonda Walker is entitled to a new trial on her claim for negligent infliction of emotional distress.

AFFIRMED IN PART, VACATED IN PART, and REMANDED for further proceedings.

FABE, Chief Justice, with whom CARPENETI, Justice, joins, dissenting.

FABE, Chief Justice, with whom CARPENETI, Justice, joins, dissenting.

Today the court effectively overrules its decision in *Loeb v. Rasmussen,*[1] which held that a liquor licensee "is not entitled to assert the comparative fault of the minor/consumer, in an action for damages resulting from the unlawful sale of intoxicating liquor."[2] Because the issues that the court grapples with were already addressed and decided in *Loeb,* and because I do not believe that the high threshold for overruling settled precedent has been met, I would adhere to *Loeb* and affirm the superior court's decision to hold the liquor store liable for the deceased minors' share of the fault for the accident.

Stare decisis requires that we "overrule a prior decision only when clearly convinced that the rule was originally erroneous or is no longer sound because of changed conditions, and that more good than harm would result from a departure from precedent."[3] We have stated that "a prior decision may be abandoned because of 'changed conditions' if 'related principles of law have so far developed as to have left the old rule no more than a remnant of abandoned doctrine, [or] facts have so changed or come to be seen so differently, as to have robbed the old rule of significant application.' "[4]

The court concludes that *Loeb* has been superseded by the enactments of AS 09.17.060, which codified our system of comparative negligence, and AS 09.17.080, which instituted our system of pure several liability. The court states that the liquor vendor defendant in *Loeb* was "unable to rely on" these tort reform statutes because the claims in that case arose before these statutes were enacted.[5] But the *Loeb* court specifically addressed the policy questions raised by comparative negligence, and the subsequent adoption of a scheme of pure several liability has not "robbed [*Loeb* ] of significant application" or rendered it "no more than a remnant of abandoned doctrine."

Comparative negligence was judicially adopted long before the *Loeb* claims arose, and the *Loeb* court also specifically addressed its codified version.[6] The *Loeb* court concluded that AS 09.17.060 was "not at all inconsistent with our past decisions, holding that the laws prohibiting the sale of alcohol to minors and obviously intoxicated persons are intended to place the entire responsibility for subsequent harm on the violator."[7] In other words, the *Loeb* court specifically rejected the argument, made by the *Loeb* dissent[8] and revived here by the court,[9] that the adoption of a comparative negligence system robbed AS 04.21.020 of its character as an exceptional statute, which for policy reasons confers extra liability on a licensed liquor vendor when harm results from its ille-

1. 822 P.2d 914 (Alaska 1991).

2. *Id.* at 919–20.

3. *Pratt & Whitney Canada, Inc. v. Sheehan,* 852 P.2d 1173, 1176 (Alaska 1993) (internal quotation marks omitted).

4. *Id.* (alteration in original) (quoting *Planned Parenthood of Se. Pa. v. Casey,* 505 U.S. 833, 855, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992)).

5. Op. at 1150–51.

6. *Loeb,* 822 P.2d at 918–19. The court refers to *Loeb's* discussion of AS 09.17.060, which codi-

fied comparative negligence, as "dicta" (Op. at 1150 n. 63) because the claims at issue in *Loeb* arose before the enactment of AS 09.17.060. However, comparative negligence had already been judicially adopted in *Kaatz v. State,* 540 P.2d 1037 (Alaska 1975), and the court does not explain how the codification of this already adopted rule should invalidate the *Loeb* court's analysis.

7. *Loeb,* 822 P.2d at 918.

8. *Id.* at 922 (Moore, J., dissenting).

9. Op. at 1154–55.

gal sale of alcohol to a minor. The *Loeb* court reasoned that "children are not competent to assess in any meaningful way the risks involved in the use of alcohol" and that while a liquor vendor might be "able to exploit this lack of competence" by selling alcohol to a minor, there was no legitimate reason to allow the vendor "to exploit it further, by having its liability to the plaintiff reduced because [the minor] failed to exercise the same degree of care for her own safety reasonably expected of one more able to assess the risks, when she purchased and used [the liquor vendor's] product." [10] This reasoning retains its strength today and is as applicable in this case as it was in *Loeb.*

While the *Loeb* court addressed the effect that the adoption of comparative negligence had on cases involving the sale of alcohol to minors, it did not specifically address the effect of the adoption of pure several liability. It determined that there was no need to do so because that case "[did] not involve multiple defendants." [11] It went on to explain that "[m]ultiple defendants might complicate a case when an injured third party brings action against both the minor and the liquor licensee, or when more than one liquor licensee has unlawfully provided the minor with liquor." [12] As the court recognizes in this case, the adoption of pure several liability means that "of the total fault for harm attributable to defendants—not the claimant—the court shall enter a judgment against each defendant only for the defendant's own percentage of the total fault." [13] But here, as in *Loeb,* the estates of the deceased minors are the only claimants and only one defendant, the liquor vendor, remains in the case. The issue before the court is, precisely as it was in *Loeb,* simply whether the liquor vendor defendant's liability should be reduced by the amount of the intoxicated minor claimants' comparative negligence, not how liability should be apportioned between multiple de-

fendants. The *Loeb* court appears to have assumed that the adoption of pure several liability would not change the outcome of such a case. I believe that this assumption was correct.

The adoption of pure several liability does not alter the rationale behind the *Loeb* decision and thus should not alter the outcome of this case. Adoption of a scheme of pure several liability ensures that a liquor vendor cannot be held liable for all of the damages in a situation where multiple actors are at fault, such as other drivers in a case involving a multiple-vehicle car accident, or the Cancels and the Binghams in the instant case. But where, as here, a single liquor vendor illegally sold alcohol to minors who became intoxicated and acted irresponsibly, the *Loeb* exception should continue to hold the liquor vendor liable for the intoxicated minors' share of the fault in order to accommodate our judgment that "children are not competent to assess in any meaningful way the risks involved in the use of alcohol." [14] If adoption of a comparative negligence system did not eliminate this exception and the policy reasoning behind it, adoption of pure several liability should not eliminate it either.

The *Loeb* court recognized that there was a "split of authority in this area of law" in other jurisdictions and nonetheless concluded that its holding "best comports with existing Alaska law and sound public policy." [15] The court states today that "*Loeb* now represents the minority view." [16] But *Loeb* represented the minority view at the time it was decided. *Loeb* was a decision grounded in Alaskan law and policy, not the adoption of the decisions or reasoning of other states.

The court discusses the state of dram shop law in the four jurisdictions whose decisions were cited in *Loeb:* Florida, Iowa, Minnesota, and Louisiana. Florida retains a system of dram shop liability similar to *Loeb's.*[17] As

---

10. *Loeb,* 822 P.2d at 919.

11. *Id.* at 920 n. 15.

12. *Id.*

13. Op. at 1150.

14. *Loeb,* 822 P.2d at 919.

15. *Id.*

16. Op. at 1153.

17. *See Booth v. Abbey Rd. Beef & Booze, Inc.,* 532 So.2d 1288, 1290 (Fla.Dist.App.1988). In Florida, a liquor vendor is exposed to liability based on an illegal sale to a minor only if the sale was made "willfully," which distinguishes Florida

was the case when *Loeb* was decided, Iowa does not apply comparative negligence in dram shop actions and holds liquor vendors entirely liable for the actions of intoxicated patrons who were sold to illegally.[18] But Iowa only allows suits by innocent parties.[19] The dram shop statute in Minnesota now contains language that specifically limits the liability of liquor vendors based on comparative negligence or related principles [20]—the type of language Alaska's dram shop statute did not contain when *Loeb* was decided, and still does not contain today. Though no appellate court has addressed the issue, Louisiana does seem to have changed course since *Loeb*, as the court notes,[21] apparently deciding that adoption of a comparative negligence system should reduce a liquor vendor's liability by the amount of an intoxicated minor's comparative fault. But this is precisely the conclusion that *Loeb* rejected.[22] These developments in a handful of states hardly constitute "a general erosion of support" for *Loeb* or its reasoning.[23] *Loeb* remains a minority position, grounded in Alaskan law and policy, as it was at the time that it was decided. Thus no significant "changed conditions" [24] exist that justify overruling it.

Finally, the court simply has not addressed whether "more good than harm would result from a departure from precedent." [25] I am not convinced that more good than harm would result from reducing the consequences faced by liquor vendors who illegally sell alcohol to minors. While the *Loeb* rule may,

as the court points out, "cause[ ] the liquor provider to provide insurance for all of the minor's conduct after furnishing alcohol" [26] illegally, a liquor vendor can quite easily avoid shouldering this responsibility by consistently checking identification and refusing to furnish alcohol to minors.

For these reasons, I respectfully dissent.

---

law from Alaska law. Fla Stat. ann. § 768.125 (West 2005). However, a "willful" sale to a minor can be established by circumstantial evidence relating to the minor's apparent age. *See Gorman v. Albertson's, Inc.,* 519 So.2d 1119, 1120 (Fla.Dist.App.1988). Thus, the practical difference between Florida's "willfulness" requirement and Alaska's immunity for liquor vendors who conduct a "good faith" identification check may be small.

18. *Slager v. HWA Corp.,* 435 N.W.2d 349, 358 (Iowa 1989).

19. *Id.* at 351–52. Some other states also do not reduce a liquor vendor's liability by the amount of an intoxicated patron's comparative negligence, providing some support for *Loeb,* but also do not allow suits by intoxicated patrons themselves. *See, e.g., Aanenson v. Bastien,* 438 N.W.2d 151, 152–54 (N.D.1989).

20. *See* Minn.Stat. ann. § 340A.801 (West 2004) (providing that dram shop actions are subject to comparative negligence); *VanWagner v. Mattison,* 533 N.W.2d 75, 80 (Minn.App.1995) (recognizing that the legislature has explicitly made dram shop actions subject to comparative negligence).

